IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

     v.

BHUPINDER SINGH VIRK,
Defendant.

IND No.: 22 Cr. 618 (JPC)

<u>SENTENCING
MEMORANDUM</u>

RESPECTFULLY SUBMITTED,

SULLIVAN|BRILL, LLP
Attorneys for Mr. Virk

_____

_____

By: Steven Brill
     James Healy

Dated: May 28, 2024

## I.   Introduction

A judge does not sentence a crime, a judge sentences an individual. The crime in this case is serious, carrying with it a massive guidelines calculation of 37. Even with zero criminal history points, the guidelines range is a staggering 210-262 months. The individual in this case, Bhupinder Virk, however, deserves a closer look, beyond just the crime he committed. He is more than the terrible choices that brought him to stand before the Court, facing decades in prison.

In the face of a difficult childhood, literally foreign to that of those growing up in the United States, Bhupinder remained positive and undaunted. He did not give up; he chased his dreams; he did everything right—until the moment he, for the first time in his life, did not.

Since he was a little boy, family and faith informed every decision Bhupinder made. Even when both those things created difficulty or adversity, he faced those challenges with optimism, with hope and with a spirit of selflessness that is in stark contrast to this single, unquestionably bad act that led to his conviction. Yet this one crime does not define Bhupinder, does not negate all he has been, nor should it extinguish what he can still be. Bhupinder takes responsibility for his actions and comes before the Court knowing he will be punished. The Court must determine what is the just punishment, not for the statute, not for the guidelines number but for the man. It is respectfully suggested when reviewing all the relevant sentencing factors, that a below guidelines sentence, as advocated by Probation is appropriate. However, the 180 months suggested by Probation is too high, and

it suggested for reasons discussed below that a sentence of 90 months is sufficient but not more than necessary.

## II.     BUHPINDER VIRK'S  HISTORY AND CHARACTERISTICS WARRANT A SENTENCE OF 90 MONTHS

There is no way anyone can appreciate the way in which Bhupinder arrived in this country and came to commit the crime for which he has been convicted without first having a basic understanding of the place from which he came. Bhupinder was born a Sikh, in the Indian state of Punjab. Although in India as a whole, Sikhs represent less than 2% of the population, in Punjab they represent a majority of a little more than 50% of the population of that area.

The Sikh community in the area of Bhupinder's youth centered around the Gurdwara. It was a place of worship as well as a center of community connection and learning. It was open to anyone who is seeking shelter or food regardless of religious or cultural background; everyone was welcome. The Gurdwara was the place where Bhupinder established his connection to Sikhism, and where he learned the tenets of that faith, including truthful living, service to humanity and devotion to God.

### *Early life*

In 1993, Bhupinder was born as the first of two children to his mother Jasvir, a housewife, and his father, Jasminder, a farmer. His first memories are of living in a house with basically his entire extended family, as many as 14 people.  All the cousins lived in one room and slept in one bed. When Bhupinder thinks of that now, with the passage of time and the context of the

United States, he understands that his family lived in abject poverty. Yet, that is not how experienced it as a child.

While there were certainly personal conflicts with so many living in such close quarters and with very limited resources, he learned that, despite the sometimes volatile fighting, family was the most important thing. He remembers, starting around the age of eight or nine, when the bickering became too intense, walking the two miles to his family's land, where his father earned his living by farming the few cows they had. Jasminder would good-naturedly put Bhupinder "to work," having him help cut the grass, get water for the animals and assigning him any other small chores that needed doing. It was during this time that Bhupinder forged an unbreakable bond with his father and grew to love the land that provided for the family.

It was also during this early time that Bhupinder remembers learning what it meant to be a Sikh. To hear him describe it, Sikhism is not just a system of beliefs, rather it is an imperative as how to be in the world, a way to find and define yourself. I fostered a way to connect to the larger community and, in the process, do good in the world. In the video submitted to the Court as **Exhibit A**, his father recounts with pride Bhupinder's early connection to the Gurdwara Sahib, showing pictures on his phone of his young son becoming integrated into the Sikh community.






Bhupinder's childhood instilled in him a deep commitment to his family and to Sikhism. By the time he was a teenager, Bhupinder recalls that, because he was only average at school and his younger sister excelled, he became an actual farm worker, side by side with his father, providing for the family. This was something he did willingly and without feeling anything other than pride that he was helping his family.

At that time, he was also biking five miles to the next village to go to school every day. The school was mostly Hindi. There was in Punjab an open and growing political and religious hostility between the Sikhs and the Bharatiya Janata Party ("BJP"), a right-wing Hindu nationalist party. There was undisguised antipathy between the BJP and the Sikhs. As Bhupinder, a Sikh, began attending a Hindi high school, he describes himself as "never feeling safe."

### Highschool, University and fear for his life

Bhupinder's fears were manifested, first in 2011, when he was 17 years old. As a proud and active Sikh, Bhupinder was in a neighbouring town putting up fliers inviting people to join his Gurdwara when members of the BJP caught him and severely beat him. At the conclusion of the beating, while Bhupinder was lying bleeding on the ground, the leader of the group told him, "this is your first and last chance." By that, Bhupinder understood that if he did not capitulate and join their party, giving up his cherished Sikhism, the next time they saw him it would be far worse.

Even though the prevailing opinion in Bhupinder's town was that the police were bought-and-paid-for by the BJP, when he finally got home that day, Bhupinder's father went to the police to ask for help. They did nothing.

It was around this time that Bhupinder began to pursue his quietly held dream of going to college in America and playing football (soccer) for an American school. He truly believed he was good enough to play soccer at that level, and he thought this would keep him safe and alive, along with providing

the education that his parents wanted for him. He applied for a student visa to come to the United States three times in 2011 and 2012 but was denied all three times. The reason, as he understood it, was because he had no family in the United States.

Rather than giving up, Bhupinder adjusted his dream and enrolled at Punjab University, which was approximately 60 miles from his home. He studied engineering, specifically automobile design because he loved cars and, more so, he loved to drive.  He was also talented enough to play on the school's football team. In some respects, even though he felt unsafe, he was still moving toward some encouraging future.

However, Bhupinder could no more give up his identity as a Sikh than he could give up being Jasminder and Jasvir's son. He was cautious, and tried not to draw attention to himself, but even so, while driving from his university towards home, in January of 2016, four cars filled with BJP activists, including the same people who had beaten him before, followed him and forced him off the road. They broke the windows in his car, in order to drag him out of the vehicle, and began an even more savage beating. During the beating, one of the leaders displayed a gun, and Bhupinder believed he was about to be killed. Although having been stripped naked, he began to run for life and did not stop until he reached home. His father, shaken at what had happened, again went to the police asking for justice, and, as before, nothing was done.

A few months later Bhupinder was targeted for the third time, this time in his own town as he was participating in organizing a blood drive in the

7

Gurdwara. Once again, he was subject to a vicious attack. This time he suffered an injury to his back that ended his ability and dream to play football and ultimately led to his addiction to opium.

His parents understood it was only a matter of time until their son was going to be killed. They knew they had to do something. Leading up to this, they had already tried, twice, to apply as a family for visas to relocate to Italy, where they knew no one and did not speak the language, to try to keep Bhupinder safe; they had been denied both times. For the Virks, family is all, and so his father did not hesitate; he sold his land, his farm, in order to pay an "agent" to get Bhupinder out of the country.[1]

### Coming to America

Ashamed that his father had sold the land to protect him, Bhupinder nonetheless respected the sacrifice and began an odyssey that took him from India, to Moscow, to Japan and then Mexico, none of which offered him immigration status. In Mexico, he ended up spending 34 days in a "camp" near the United States' border with just the clothes on his back and little to no food. Finally, he was taken to a wall and told to climb over. This was California, where he was promptly arrested by Immigration and Customs Enforcement ("ICE") and placed in another, slightly better, camp for 45 days.

During this time, he was interviewed by ICE and was told that to be released from the camp he needed a $25,000 relative-bond to be posted. An

---

[1] These agents are analogous to the Coyotes who bring undocumented immigrants into the United States through Mexico.

Aunt, living on the east coast, provided the funds, and Bhupinder was released. It was at this time, in 2016, that he first sought asylum.[2]

The wait to get a work permit was six months and Bhupinder applied. It was during this six-month waiting period that he committed the only "infraction" with respect to the immigration process. With no family in California and no money to feed or clothe himself, he took an under-the-table job at a 7-11. He worked 7 days a week for 16 hours a day and was paid $5.00 an hour.

Once his work permit was approved, Bhupinder focused on a new dream. His ability to go to school and to play football was over, but he decided to set about getting a CDL license. He had always loved cars and driving, and he had a desire to see America. Trucking was a perfect fit. He also felt he had to help earn money to support his family back in Punjab, as they no longer had the land to farm, having sold it pay for his escape from India. In addition, he was concerned for his younger sister, Jatinder. Although she was the better student, as a Sikh it was not safe for her to attend the Hindu university. In his culture, if woman was not pursuing an education, it was expected that she would get married. He worried, with no money coming in from farming, who

---

[2] Mr. Virk makes the following objection to the final presentence report dated May 10, 2024: on page 16, ¶ 76, and again on page 27, the PSR indicates that Bhupinder Virk applied for asylum in 2021. Mr. Virk asserts that immediately upon entering the country illegally in 2016 he began the process of seeking asylum, filing the appropriate applications. The process culminated with is being granted asylum on June 20, 2021. A copy of the application for asylum is attached as **Exhibit B**.

would help finance and arrange her marriage, as is the custom in the Sikh community.

After earning his CDL license, he moved to Fresno, California, which has a sizeable Sikh community and is a hub for California trucking. He began working as a driver for a few different companies, driving all over the country and beginning to earn enough to support himself. Now no longer afraid for his life, he cultivated and chased a new dream: owning his own trucking business, getting asylum in a country he was growing to love, being able to provide safety to his family and finding a wife and starting his own family. These were not implausible dreams, and as he worked hard, he made significant progress toward making them a reality.

By 2019, he had formed a company, Fateh Express Trucking and was making enough money to help his family. He recounts that the first thing he did when had enough money was to buy back his family's land in Punjab. His parents were grateful, but also reported that members of the BJP had come to the house looking for him. The conflict and tension had not abated, and they expressed concern for his sister, a single Sikh woman's, safety.

Bhupinder felt it was his responsibility to keep her safe. He recalls paying 6,000,000 rupees to get her to Cananda, where she could take part in an arranged marriage. She was able to flee to Canada, but the man who was intended to be her husband was just looking for money and had not intended to marry his sister. Ultimately, Bhupinder was able to get her safe in Canada

and arranged and financed a marriage. The wedding took place while he was in custody.

It was around this time, heading into 2020, that the trucking business hit a significant downturn. Bhupinder recalls that for him it felt that his circumstances were becoming desperate. Not only was he unable to continue his with his plan to help his parents and to establish his sister safely out of Punjab, but his nascent trucking business was failing. He was advised that declaring bankruptcy would doom his pending asylum application. He lost several of his drivers and was forced to sells some of trucks.[3]

For the first time in his life, Bhupinder's optimism and commitment to his faith and himself faltered. Feeling his back was to the wall, Bhupinder made the disastrous choice to become involved in conspiracy for which he now must be sentenced. At first, he tried to convince himself that what he was doing was not harmful, not violently criminal; it was simply transactional—making calls and arranging for boxes to be brought from sellers to buyers. However, as a man dedicated to the precepts of Sikhism and having spent his life committed to improving the circumstances of his family, his friends and his community, Bhupinder cannot maintain that self-deception. He appears before the Court today knowing that he cannot insulate himself from the damage that drugs create in individuals and in society as a whole. He is deeply ashamed of his role in facilitating a system that has caused so much pain and devastation,

---

[3] Mr. Virk is not contesting the forfeiture of the $487,900 seized at the time of his arrest, however, it is important to him that the Court know that a large part of the cash in his home were the proceeds of the sale of his trucks.

and he knows that his acceptance of responsibility requires that he be punished.

### *Who is Bhupinder Virk?*

The Court must sentence the man not the crime. With respect to Probation, which did a thorough but only one-day interview, the essence of Bhupinder Virk prior to committing this single crime cannot be adequately expressed in the PSR. The people who know Bhupinder best have submitted letter after letter articulating the core of the man they have come to know, respect and care for. Copies of these letters are attached as **Exhibit C**. These individuals are not offering opinions based on a conversation with Bhupinder; they are presenting the Court with facts proven to them through years of witnessed actions.

Navot Singh, who has known Bhupinder since he arrived in America, recounts the following:

> One of Bhupinder's most admirable traits is his compassion for others. He has always been quick to offer a helping hand to those in need, whether it be through volunteering in our community or providing emotional support to friends and family facing hardships. He even helped me numerous times that involve getting me a job, putting me into a driving school, taking care of me when I had no roof over my head. His empathy and willingness to assist others speak volumes about his character.

Harman Singh has known Bhupinder for 25 years, most of his life. He describes going through a difficult time while at college when his mother became ill. Mr. Singh was considering giving up school to take care of his mother. Bhupinder not only offered advice, empathy and motivation, but practical help as well:

Later, he followed up with me and offer[ed] to help in taking my mother to doctors when needed.  Not only that he also helped me find a part time job. His willingness to go above and beyond to assist me during the difficult time was truly heartwarming and deeply appreciated. I still remember him for this and felt truly grateful to have a friend like him in my life. If it wasn't for him and his kind words during that time, I am not sure if I would have been able to come out of that situation.

Harmeet Singh, Bhupinder's cousin, remembers a time when he was struggling with providing for his family, financially and emotionally:

it sometimes get really hard for me to provide for the family and also making sure to give time to my kids and wife. Bhupinder is my strong support pillar. He voluntarily helped my dad in the farms when I was at work. I used to feel bad for not actively helping my dad because of his old age but however I could totally rely on Bhupinder knowing that he is there when he need any help. He helped me save my marriage and making sure that I was spending quality time with my kids.

 Renu Tandon has known Bhupinder for 15 years, and eloquently describes knowing Bhupinder during this time:

His actions, whether in times of challenge or celebration, have fortified the bonds within his family, earning him deep respect and admiration from both relatives and friends. Beyond the confines of his immediate family, he extends his supportive nature to the wider community. He is known in our neighborhood for his voluntary involvement in local initiatives and charitable activities, which underscore his altruistic spirit and dedication to societal welfare. His efforts range from organizing community clean-up drives to participating in fundraisers for local schools, illustrating a genuine commitment to enriching the lives of others. This blend of familial devotion and community service highlights not only his character but also his significant impact on improving the collective well-being of our society.

Each individual writes of their firsthand experience of Bhupinder, and the same words come up again and again: compassion, responsibility, integrity, reliable, generosity and kindness. The letters characterize him as someone

devoted to family and passionate about his faith. To understand who Bhupinder was before becoming involved in the conspiracy, the Court is urged to read the attached letters.

Bhupinder did not come to this country as a criminal; he came here to save his life, as evidenced by his being granted asylum (finally) in 2021. His history and the evidence presented by the people who have longstanding, firsthand knowledge of his character indicate that he was an exemplary man who in a moment of ruinous weakness and poor judgment committed a terrible crime.

### III.    OTHER MITIGATING FACTORS UNDER §3553 WARRANT A SENTENCE OF 90 MONTHS

A sentencing court must also consider other § 3553 factors when engaging in an "individualized assessment based on the facts presented" and may "not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007) (rejecting notion that "extraordinary circumstances" are required to justify a sentence outside the Guidelines' advisory range). In Bhupinder's case, these factors indicate that a below guidelines sentence is appropriate.

### A. Nature and Circumstances of the Offense

Large scale drug trafficking is, without question, a serious crime. Bhupinder would not dispute that fact, and he deeply regrets taking part in the conspiracy. Yet it should not go unnoted that Bhupinder was not an owner or

buyer of the narcotics, nor was he an organizer, leader or manager of the conspiracy. His role in the conspiracy was non-violent, and for the most part, at arm's length.[4] Furthermore, Bhupinder was not part of, nor tied to, the "Wolfpack Alliance" as the other conspirators were.

Therefore, although the nature of criminal conspiracy should not be minimized in any way, in this case, Bhupinder's circumstances in the conspiracy were very different from the other indicted and unindicted conspirators.

### B. Promote respect for the law and to provide just punishment

Bhupinder understands that as a consequence of accepting responsibility for his crimes he must go to prison for at least 60 Months, and in the worst-case his guidelines range could keep him in prison until he is over 50 years old. Probation has indicated that it believes the guidelines range is excessive and has recommended a variance to 180 months. This Court must now determine what sentence is "sufficient, but not greater than necessary," or more succinctly was it just punishment for Bhupinder.

Prior to *Booker* "just punishment" was circumscribed as existing solely within the objective vacuum of the sentencing guidelines. Courts now are aware that a guidelines calculation of 37 with a criminal history of I could reflect the commission of an assault with intent to commit first degree murder

---

[4] Mr. Virk was arrested while in possession of a firearm and does not dispute the 2-point enhancement that this created, however it is important to him that the Court know that weapon was bought for personal protection and was not alleged to be used in any way in furtherance of the conspiracy or in any other way.

in which the victim sustained a life-threatening injury, *see* U.S.S.G. 2A2.1, selling/trafficking in more than 600 images of child pornography, *see* U.S.S.G. 2G2.2, money laundering more than $10,000,000 derived from a crime of violence, *see* U.S.S.G. 2S1.1, or, as in this case, facilitating the transport of a large amount of illegal narcotics. Even if only considering the crime, just punishment cannot be same for each of these crimes, nor can it be definitively said to be found within a guidelines range that does not consider the individual.

Punishment is not just incarceration. In Bhupinder's case, he is acutely aware that for whatever time he is in prison his parents and his sister will be without his support. His concern for his family weighs heavily on him, and, given the political/religious tensions in Punjab, he cannot help but be afraid for them. Watching the video from his parents and sister shows in heartbreaking fashion the extent to which they love and rely on him and the amount that they will suffer while he is in prison, his mother going so far as to beg the Court to punish them along with their son. (Exhibit A)

In addition, although he was granted asylum in 2021, it is likely that once released from prison Bhupinder may have that asylum revoked. More than just the potential loss of his dreams and hopes for a future in America, this would mean going back to a country where his life was in real danger. To languish in prison for more than a decade waiting for the day in which he would be sent to a place, no longer home, where he would be starting from less

16

than zero and where people have shown a real desire to kill him, seems excessive and unjust.

### i.    The time spent in the MDC should be considered

Bhupinder has already spent significant time in the MDC. It is no secret that the conditions in the MDC are far worse than the framers of the sentencing guidelines had contemplated. "It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC." *United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024) (collecting cases). *See also, United States of America, V. Jose Santana*, No. 22 CR. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) (reducing sentence "given the severe prison conditions that prevail at the MDC").

Apart from the acknowledged "often-deplorable conditions at the MDC," *United States v. Stewart*, No. 21-CR-42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023), Bhupinder has suffered specifically. There are no Sikh chapel services he can attend, or even recognition of Sikhism as a religion. Further, Sikh dietary restrictions are not respected, which has forced Bhupinder to try to create a compliant diet from whatever he can cobble together. As such, it was not unexpected that he has lost significant weight.

In addition, because he is slight of build, and because he is not an experienced criminal, he has been targeted several times while in the MDC by members of gangs trying to use intimidation and violence to obtain money from

him. At one point, he was punched in the face, breaking his jaw. As is often the case at the MDC, medical treatment was not provided, and so, for more than a month, Bhupinder was unable to eat normally, causing further weight loss. As a result of the attack, the administration at the MDC transferred him out of his original unit, but because illegal phones run rampant in the MDC, a "call" was made alerting gang members on his new unit that "the new Indian guy has money."

In determining the appropriate sentence, it is respectfully requested that whatever number of months the Court feels is sufficient, it find that this time be mitigated by the fact that Bhupinder has spent 15 months in the MDC which has been described "as inhumane, cruel and harsh, and unreasonably unjust." Hon. J. Collen McMahon, *United States v. Days*, 19-CR-00619. Those 15 months should count for more and Bhupinder's sentence adjusted accordingly.

C. **The Court should Avoid Unwarranted Sentencing Disparities**

As documented in the final PSR, for the last five years there were 85 defendants who were sentenced with § 2D1.1 offense levels of 37 and criminal history categories of I. "For all 85 defendants in the cell, the average sentence imposed was 145 month(s) and the median sentence imposed was 144 month(s)."

(PSR p. 23). What this indicates is that, even if a court were to sentence a crime rather than an individual, the average sentence for this "crime" is **years** less than Probation's recommendation of 180 months.

### D. Bhupinder Has Hopes and Dreams for The Future (deterrence and protecting the public)

> Bhupinder has shown remarkable resilience in the face of adversity. Despite facing numerous challenges in his life, he has remained steadfast in his determination to overcome obstacles and strive for a better future. I have witnessed first-hand his commitment to self-improvement and his sincere efforts to learn from past mistakes.

(Exhibit C Letter from Mandeep Kaur).

Despite all his setbacks, the knowledge that he will be going to prison for years and the concern that he may not be able to remain in the country that he loves and that has kept him safe, Bhupinder continues to dream of a better future. Yet, he does more than dream. During his time in prison, he has voraciously made use of the courses and training programs offered. He has taken at least 13 to date with no plan to stop. Copies of the certificates he has earned are attached as **Exhibit D**.[5]

Specifically, he speaks with excitement and hope when describing his plan to marry and start his own family. His girlfriend of five years, Shailpreet Kaur, expresses her similar commitment.   "For anything in this world, I would not give up on him and definitely consider myself lucky to [have] met him." Thus, it is no surprise that Bhupinder, a single, not yet married man took a parenting course at the MDC. (Exhibit C). He is not only determined to be a father, he is determined to be an outstanding father.

---

[5] It should be noted that many of the letters in support are from men with the name "Singh." In the Sikh faith many baptized males take the surname Singh as a symbolic affirmation of belonging to one family and to show opposition to caste. Similarly, women adopt the last name of Kaur for the same reasons.

Bhupinder also dreams of one day owning a truck yard that would house trucks between hauls, have mechanics, washing stations and other necessary services needed for the vehicles. This is no ungrounded fantasy. Bhupinder can talk about at length the amount of capital he would need to raise, the best location for such a facility and the potential financial viability of such an operation. Indeed, reviewing the programs he has taken at the MDC demonstrates his determination to make this business a reality. The courses include Entrepreneurship, Marketing Basics, Business Acumen, Basic Bookkeeping, Effective Communication and Leadership and Influence.

The people who know Bhupinder express the confidence that his crime, serious as it is, will not define who he will be in the future.  Mandeep Kaur writes, "I firmly believe that the Respondent is capable of overcoming this challenge, learning from it, and continuing to be a positive influence within our community." His aunt, Renu Tendon, echoes this confidence stating, "I am confident that with the appropriate support and guidance, the Respondent will make positive changes and continue to be an asset to society." (Exhibit C). Kultar Singh is convinced that Bhupinder is up to the challenge, writing "[w]hile accountability is necessary, I firmly believe that rehabilitation and support are equally important in facilitating positive change. I am confident that Bhupinder is capable of redemption and can make meaningful contributions to society if given a second chance."

The Court should take notice, however, that the hope for Bhupinder's future does not rest on reliance on him alone. "Bhupinder has a strong support

system in place, including friends and family members who are dedicated to helping him navigate through this difficult time and encouraging him to make positive choices moving forward." (Navot Singh Exhibit C). Those who he has helped and supported in the past have committed to be there and help and support him going forward, and every single one has expressed steadfast confidence "that, with the appropriate guidance and support, he can emerge from this situation." (Shailpreet Kaur Exhibit C).

Bhupinder's commitment to his faith cannot be discounted when the Court considers his eventual release from custody. For Bhupinder Sikhism is not a dusty collection of the writings of Guru Nanak to be considered for an hour or two once a week while at the Gurdwara. It defines him and describes a proactive way of being in and of the world. His girlfriend expresses the following.

> What I like most about him was his involvement in his religion. He firmly believed in higher power/ god and would go to Sikh temple almost every week. I was so impressed with his love for god and how he would go to temple and help distribute food for free among people and help clean up and organize charities.

(Shailpreet Kaur Exhibit C).

Bhupinder's letter to the Court, attached as **Exhibit E**, contains promises he makes:

> I can promise that I am committed to making amends and to demonstrating through my actions that I am capable of positive change, and I promise I will never cause any harm to any other person. I am also learning that I cannot carry the whole world, and I am open to seeking guidance and support to help me keep my promise that I will become a better, more responsible member of society.

21

**E. In his own words**

Indeed, Bhupinder's letter to the Court (Exhibit E) should be considered in

its entirety:

> I Bhupinder Singh, writing to express my deepest apologies for the mistake I have made and to ask for your forgiveness.
>
> First, I take full responsibility for my actions. I recognize that I have committed an offense, and I deeply regret the impact it had on others and on the community. I understand that my actions were not only wrong but also went against the laws and regulations that are meant to uphold order in our society.
>
> I want to assure you that this experience has been a wake-up call for me. It has made me reflect deeply on my choices and the consequences they can have especially when I think of my family. I don't offer any excuse for my offense, and now I truly understand how important it is to make responsible decisions especially when everything is going wrong in life.  Living without loved ones so far away and the heavy weight of being a responsible son who need to take care of whole family really took a toll on me. Then, when I was facing the loss of my business I lost myself and couldn't see any other way to get out of the situation. I couldn't bear the thought of being a failure in life, be it as. a son, brother, friend, boyfriend.
>
>  I have always tried to make my loved ones happy and comfortable even at a cost to myself.  In the process, I started to seeing others happiness as mine.  Living by myself, facing these struggles alone and not opening up with friends and family pushed me deep down in a dark place. It was in that place that I started telling myself that money was the was the solution to everything. Maybe if I had my loved ones with me, or maybe if I didn't take the pressure of responsibilities too much on me, or maybe if I had relied more on my faith; there would have been a different story. I have learned that whatever pleasure you get from money does not last when it has been gained from doing something against what you know deep inside is right.
>
> My parents used to take so much pride in me for being the son I was. Everybody used to say good things about me when I was out in the world helping people. I am ashamed they will now know

that I made a terrible choice, choosing the wrong path instead of working hard. Having hurt so many, I realize the importance of making responsible decisions and abiding by the law at all times. I want to be the person I was supposed to be.

Your Honor, I am truly sorry for any harm, or disappointment my actions may have caused. I understand that my behaviour has let down not only myself but also my family, friends, and the community. I can promise that I am committed to making amends and to demonstrating through my actions that I am capable of positive change, and I promise I will never cause any harm to any other person. I am also learning that I cannot carry the whole world, and I am open to seeking guidance and support to help me keep my promise that I will become a better, more responsible member of society.

I understand that the consequences of my actions are ultimately in your hands, Your Honor. I accept whatever punishment or conditions you deem appropriate. I am willing to comply with any requirements, such as counselling, as a way of making things right.

I still have so many dreams of what my life can be.  I promise I will hold on to them until I am released from prison.

Thank you for taking the time to read my letter. I appreciate your consideration and understanding.

Regards,
Bhupinder Virk


His own words make clear that he lost his way for a time when he became caught up in this conspiracy. He accepts responsibility for his devastatingly bad choice. For a time, he lost sight of his hopes, his dreams for the future and what is held central to the Sikh faith. Once he completes his sentence, there is no danger of recidivism and no need to "protect society" from someone that wants nothing more than to do good in the world and follow his

dreams. As he says to the Court, "I want to be the person I was supposed to be." (Exhibit E).



### F. What is Just Punishment?

As is expected, the letters in support of Bhupinder request the Court be lenient when sentencing him, but many of the letters ask for something not quite so expected—something that places a somewhat heavier burden on the Court that is already shouldering what the Supreme Court has already acknowledged is perhaps the most difficult task a judge can undertake. *See Graham v. Fla.*, 560 U.S. 48, 77, 130 S. Ct. 2011, 2031, 176 L. Ed. 2d 825 (2010), as modified (July 6, 2010) ("Few, perhaps no, judicial responsibilities are more difficult than sentencing."). Consider the following:

- As Bhupinder's friend, I respectfully request that you consider the entirety of his character and the circumstances surrounding this case. I believe that he deserves a fair and just outcome, and I trust in your wisdom to make the right decision.

(Jaspreet Singh Exhibit C)

- I trust in your ability to render a fair and just decision. I believe in the justice system and would like to humbly request to please seek other ways that let him live a good life. He a young man exploring life.

(Gurinder Singh Grewal Exhibit C)

- Thank you for taking the time to read this letter. I trust that you will weigh all relevant factors carefully in your decision-making process.

(Navot Singh Exhibit C)

- I trust in your wisdom and judgment in reaching a fair and just decision.

(Kultar Singh Exhibit C)

- I trust in your judgment to consider his character and contributions to society when reaching a decision in this matter.

(Harmeet Singh Exhibit C)

- All my hopes to be with him lies in the faith and the fairness of our judicial system and trust that you will weigh all factors carefully in reaching your decision. I sincerely hope that you will consider Bhupinder's positive attributes.

(Shailpreet Kaur Exhibit C).

These individuals who took the time to express what they know, and value of Bhupinder Virk have expressed **trust** in the Court. They trust the Court will consider the person, not just the crime, trust that Court will weigh all the factors and circumstances and trust that the Court will be fair.

To recognize that trust the Court must take the measure of the man Bhupinder was and still can be and weigh it against the crime he committed, then distill that down to a number—a number that is sufficient but not greater than necessary. Bhupinder requests 90 months. Is 90 months insufficient, but some higher number crosses the mark into sufficiency? At what point? Is

society safer after 120 months than it would be after 90? Will Bhupinder be insufficiently "rehabilitated" after seven and a half years but somehow a switch will go after 10, after 15, years?

Certainly, the simplest path would be to sentence Bhupinder to Probation's recommendation of 180 months and declare that it is a downward variance from the guidelines range. Were someone to argue that the sentence is "too lenient" for drug conspiracy, the Court could point to the five-year sentencing data and state that the imposed sentence is higher than the average. Perhaps, though, sentencing is more than taking the simplest path. In this case, perhaps the path is to ask the question, 'does this sentence the individual?' and, 'does this sentence respect the profound trust invested in the Court by those who know and love that individual?'

Bhupinder knows he deserves to serve significant prison time for what he has done, and that time will make it difficult to hold onto his hope and to follow his dreams, but he is committed and wants to believe that after finishing his punishment he parents will still be alive and well, that his sister will still be safe, that he will be young enough to start a family and that he will be allowed somehow to stay in the country that he loves. Those questions have no answers. Bhupinder understands that makes the Court a final promise, "I still have so many dreams of what my life can be.  I promise I will hold on to them until I am released from prison," (Exhibit E).  The question before the Court is how much time is enough? We respectfully suggest that a sentence of 90

months respects the goals of sentencing while taking into account the person who committed the crime and not solely the crime itself.

### IV.   Conclusion

WHEREFORE, it is respectfully requested that this Honorable Court consider the contents of this memorandum prior to imposing sentence on Bhupinder Virk and sentence him to term of 90 Months.

**I CERTIFY** that a copy of this submission has been served via ECF to both the Court and the Government

RESPECTFULLY  SUBMITTED.
In New York, New York, May 28, 2024

SULLIVAN |BRILL, LLP

By: Steven  Brill
    James Healy