

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 18, 2024

**BY ECF**

The Honorable John P. Cronan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re: *United States v. Bhupinder Singh Virk*, 22 Cr. 618 (JPC)

Dear Judge Cronan:

    The Government respectfully submits this letter in advance of the June 25, 2024 sentencing of the defendant Bhupinder Singh Virk, on his conviction for conspiracy to distribute and possess with intent to distribute narcotics. For the reasons set forth below, the Government respectfully submits that a sentence at the bottom of the range of 210 to 262 months' imprisonment calculated under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") would be sufficient but not greater than necessary to achieve the purposes of sentencing.

### I. Offense Conduct

    A.   **Narcotics Trafficking**

    The defendant is part of a drug trafficking organization that, from at least February 2022 through November 2022, conspired to ship large quantities of cocaine, methamphetamine, and other narcotics across the United States and Canada. (Presentence Investigation Report ("PSR") ¶ 11).

    In particular, between March 18 and 21, 2022, Virk and certain co-conspirators, including co-defendants Christopher Burgos, Michael Gian William Habib, and Bhupinder Singh Virk, worked together to ship 400 kilograms of cocaine to a warehouse in New Jersey. (*Id.* ¶ 12). Through an encrypted messaging application, Signal, Virk, using the alias "Joker," and his co-conspirators discussed the logistics of the cocaine shipments, including when the shipments would be arriving at the warehouse and how the cocaine would be packaged. (*Id.* ¶ 13).

    These messages show that Virk was responsible for shipping the cocaine from California to New Jersey. Indeed, one of the Signal group chats was named "Joker bus," where "bus" is slang for a narcotics shipment, indicating that the load the participants were discussing was one managed by Virk. (*Id.*). Moreover, those group chats showed that Virk played a central coordinating role in

the operation. For example, Virk initiated the group chat on March 18. In that chat, he provided updates about when he expected the packages to arrive; helped make sure that there would be people at the warehouse when the packages got there; and discussed the total "count" of packages, which appeared to be a reference to the number of kilograms arriving. Virk played a similar role in group chats on March 20 and 21, communicating regularly with other members of the chat about the arrival and handling of the packages.

Law enforcement officers seized a total of approximately 400 kilograms of cocaine shipped to the warehouse between March 18 and 21, 2022. (*Id.* ¶ 18). They then replaced the seized cocaine with "sham" drugs, so members of the conspiracy would not know the drugs had been taken. On March 21, 2022, law enforcement officers surveilled the warehouse as members of the conspiracy loaded cocaine onto a truck, and the truck departed the location. (*Id.* ¶ 19). Law enforcement officers stopped the truck soon after its departure and seized the "sham" drugs that had been loaded onboard.

Virk's participation in the chats intensified after the truck was stopped on March 21. Participants in the chat had been monitoring the truck and relayed to the group that it had been stopped by police. Virk expressed anger at other people in the chat. When Habib responded by sending a photograph of Virk's driver's license in a threatening manner, Virk answered with an expletive and told Habib to "tell ur family to be safe." (*Id.* ¶ 20).

On November 16, 2022, law enforcement officers arrested Virk near Fresno, California. (*Id.* ¶ 47). Virk was alone in his vehicle at the time of his arrest, and in possession of an unregistered "ghost" gun, a high-capacity magazine containing 20 rounds of ammunition, $8,000 of cash, and a kilogram of opium. (*Id.*). Pursuant to a search warrant for Virk's residence, law enforcement recovered two more "ghost" guns, multiple high-capacity magazines, ammunition, and approximately $479,900 in cash. (*Id.*)

Law enforcement also searched Virk's electronic devices, in addition to devices seized from his co-conspirators. (*Id.* ¶ 48). The devices showed that, between February and November 2022, Virk repeatedly discussed massive shipments of cocaine and methamphetamine with his co-conspirators, using "books" as a codeword for cocaine and "winz" or "wins" as a codeword for methamphetamine. (*Id.*). For example, in March 2022, Virk discussed with Cheema shipping "80 books," i.e., cocaine, which law enforcement seized near Kansas City, Kansas on March 2, 2022, and which contained approximately 96 kilograms of cocaine and 86 kilograms of methamphetamine. (*Id.*); *see also* ECF No. 177 at 3-4 (detailing Virk's role in the Kansas City seizure).

Virk's messages also showed that he, Cheema, and others discussed a 130-kilogram shipment of methamphetamine ("winz") that arrived at the New Jersey warehouse and was delivered without being seized by law enforcement. (PSR ¶¶ 45, 49). Similarly, on May 11, 2022, Virk participated in a group chat where he stated that "9 loads" of narcotics had been delivered to Chicago, including one load that contained approximately 200 kilograms of methamphetamine. Virk's participation in this large-scale narcotics trafficking operation continued until Virk's arrest. For example, in a group Signal chat from September 2022, Virk and his co-conspirators, including Cheema, arranged to transport what appears to have been approximately 140 kilograms of

methamphetamine ("winz"). Virk conferred with others in the chats to verify the number of boxes ("7") and the quantity of narcotics ("20 each," i.e. 140 kilos), and advised the group that his driver was on the way with the seven boxes to pass them off to another driver.

In addition, Virk and his co-conspirators discussed specific drivers of drugs loads who were arrested by law enforcement while transporting the drugs, along with the specific drug charges brought against the drivers. For example, while trying to coordinate further transport of the above-referenced 140-kilogram methamphetamine load, group chat members advised the group that that second driver had been arrested and charged with conspiracy to transport narcotics.

In total, in addition to the 400 kilograms of cocaine seized between March 18 and 21, 2022, Virk is being held responsible for trafficking approximately one ton of methamphetamine, 76 kilograms of cocaine, and the one kilogram of opium found in his car. (*Id.* ¶ 50).

## II. Virk's Guilty Plea and Applicable Guidelines Range

In a one-count indictment filed on November 16, 2022, 22 Cr. 618 (JPC), Virk was charged with conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. On December 6, 2023, pursuant to a plea agreement, Virk pleaded guilty to a lesser-included conspiracy to distribute 500 grams and more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846.

In the plea agreement, the parties stipulated to a base offense level of 38 under U.S.S.G. § 2D1.1(a)(5) and (c)(1), as the offense involved at least 1,086 kilograms of methamphetamine mixtures, 476 kilograms of cocaine, and one kilogram of opium for a total converted drug weight of approximately 2,267,250 kilograms; a two-level enhancement for possession of a firearm under U.S.S.G. § 2D1.1(b)(1); and a three-level reduction under U.S.S.G. § 3E1.1(a) and (b), assuming Virk clearly demonstrated acceptance of responsibility to the satisfaction of the Government and because he gave timely notice of his intention to enter a plea of guilty. (*Id.* ¶ 5(a)). Thus, the total offense level is 37. (*Id.*).

The defendant has zero criminal history points and is in Criminal History Category I. (*Id.* ¶ 5(b)).

At offense level 37 and criminal history category I, Virk's Guidelines range is 210 to 262 months' imprisonment, with a mandatory minimum term of 60 months' imprisonment (the "Stipulated Guidelines Range"). (*Id.* ¶ 5(c)). As offense level 37, the fine range is $40,000 to $5,000,000. (*Id.*).

## III. Probation's Recommendation

Probation's Guidelines calculation of the defendant's offense level, criminal history category, and Guidelines range matches those set forth in the plea agreement. (PSR at 26). Probation recommends a downward variance to 180 months of imprisonment, followed by four years of supervised release. (*Id.*). Probation does not recommend a fine. (*Id.*).

## III. Discussion

### A. Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. (PSR 49). The Guidelines are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established [in the Guidelines];
(5) any pertinent policy statement [issued by the Sentencing Commission];
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

**B. The Court Should Impose a Guidelines Sentence**

The Government respectfully submits that a sentence at the bottom of the Stipulated Guidelines Range of 210 to 262 months' imprisonment would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

**1. The Nature and Seriousness of the Offense**

The seriousness of the defendant's conduct supports a substantial term of imprisonment, well above the 90 months requested by the defense. Virk helped coordinate a significant international drug trafficking operation. That operation involved repeatedly moving enormous quantities of dangerous drugs, both cocaine and methamphetamine, through the United States. (PSR ¶¶ 11-23). And crucially, Virk's text messages show that he was far from a mere courier or bit player in the scheme: he played an active role in organizing the logistics of the narcotics shipments and conferred at length with his co-conspirators and the CS to secure the loads. (*Id.*).

In terms of relative culpability, the Government assesses Virk as less culpable than certain co-conspirators, such as his co-defendants Habib and Cheema. Virk does not appear to have been a member of the Wolfpack Alliance, for example, and, while Virk was the only defendant arrested in possession of firearms—multiple ghost guns and high-capacity magazines—the Government does not have direct evidence of Virk's involvement in threats or use of violence, unlike Habib and Cheema, other than Virk's threat to Habib to "tell ur family to be safe." Nor does the Government currently have any evidence connecting Virk, who is in the same unit at the Metropolitan Detention Center ("MDC") as Cheema and Habib, to the 2024 Toronto Drug Debt Shootings discussed in connection with Cheema's sentencing. *See* ECF No. 167.

But Virk was nonetheless heavily involved in various aspects of the scheme and in the trafficking of hundreds of kilograms of narcotics over the course of many months. (*Id.* ¶ 38). He demonstrated his awareness of the dangers of his activities by carrying the tools of the trade, namely multiple illegal, unregistered firearms and high-capacity magazines. And his business was lucrative, as shown by his possession of nearly half a million dollars in cash at the time of his arrest.

The seriousness of the defendant's conduct is also compounded by the broader context in which he chose to sell these dangerous drugs: a narcotics crisis that continues to claim lives across the United States and in other countries, such as Canada.[1]

Methamphetamine is a particularly potent and dangerous drug. Its abuse leads to permanent brain and heart damage, damage to other vital organs, psychosis, hallucinations, violent

---

[1] Methamphetamine Use Is on the Rise, Worsening Canada's Already Complex Opioid Crisis, https://www.theglobeandmail.com/canada/article-methamphetamine-opioids-drug-crisis.

behavior, and death.[2] The number of overdose deaths from psychostimulants (a category that includes methamphetamines) has ballooned over the past decade, increasing on average about 30 percent each year, as shown by this figure below.[3]

Figure 4. Age-adjusted drug overdose death rates involving stimulants, by type of stimulant: United States, 1999–2018

Specifically, from 2011 through 2016, the age-adjusted rate of drug overdose deaths involving methamphetamine more than tripled, from 1,887 deaths in 2011 to 6,762 deaths in 2016,[4] and overdose deaths involving methamphetamine nearly tripled from 2015 to 2019 among people ages 18-64 in the United States.[5]

And, of course, as the same graph shows, cocaine has also led to increasing deaths, and is a highly addictive substance that destroys lives, destabilizes communities, and funds criminal organizations. Cocaine use leads to, among other things, paranoia, psychosis, stroke, seizures,

---

[2] U.S. Dep't of Health and Human Services, Learn About Methamphetamine (last updated Sept. 6, 2023), https://www.samhsa.gov/meth.

[3] Hedegaard et al., CDC, Drug Overdose Deaths in the United States, 1999–2018, https://www.cdc.gov/nchs/data/databriefs/db356-h.pdf, at 4.

[4] Hedegaard et al., Drugs Most Frequently Involved in Drug Overdose Deaths: United States, 2011-2016. National Vital Statistics Reports: from the Centers for Disease Control and Prevention, National Center for Health Statistics, National Vital Statistics System. 2018;67(9):1–14, https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_09-508.pdf.

[5] *See* Nat'l Institute on Drug Abuse, Methamphetamine-Involved Overdose Deaths Nearly Tripled Between 2015 to 2019, NIH Study Finds (Sept. 22, 2021), https://archives.nida.nih.gov/news-events/methamphetamine-involved-overdose-deaths-nearlytripled-between-2015-to-2019-nih-study-finds.

respiratory failure, organ damage, and death.[6] Cocaine harms not just its users, but also their family and friends and the broader communities to which they belong. For this reason, major drug crimes are among "the most serious" offenses proscribed by federal law. *United States v. Dillard*, 214 F.3d 88, 101 (2d Cir. 2000); *see also United States v. Colon*, No. 10 Cr. 197 (CM), 2020 WL 4496761, at *2 (S.D.N.Y. Aug. 4, 2020) (describing cocaine as "a highly addictive drug that destroys lives, families, and communities"); *United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (describing study in preeminent medical journal in which cocaine was found to have "second-highest mean harm score of all twenty drugs [under study], after heroin").

The harms posed by cocaine have only increased over time. Empirical data shows, for example, that overdose deaths involving cocaine have increased dramatically in the United States over the last two decades, as shown by the more granular graphical depiction below[7]:



Figure 21. Total Number of Deaths from Drug Poisoning Involving Cocaine in the United States and the District of Columbia, 2010 – 2018

And the crisis created by the availability of dangerous drugs is in no way confined to the United States. In British Columbia, for instance, the drug crisis was first declared a public health emergency in 2016, and last year the province saw a record of more than 2,500 overdose deaths.[8]

It is against this backdrop that Virk worked with his co-conspirators to distribute hundreds of kilograms of dangerous methamphetamine and cocaine and sought to transfer these narcotics across national borders. Virk's sentence should be commensurate with the scale of this scheme.

---

[6] *See* Nat'l Institute on Drug Abuse, What Are the Long-Term Effects of Cocaine Use? (May 2016), https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use.

[7] Drug Enforcement Admin., 2020 National Drug Threat Assessment (Mar. 2021), at 30, https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

[8] Success or Failure? Canada's Drug Decriminalisation Test Faces Scrutiny, https://www.theglobeandmail.com/opinion/editorials/article-how-bad-is-canadas-drug-overdose-epidemic-american-level-bad/,https://www.bbc.com/news/world-us-canada-68621012.

### 2. The Need to Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

Without question, a significant sentence is needed here to promote respect for the law and provide just punishment. As courts in this District have recognized, the harm that is done by large-scale narcotics traffickers like Cheema and his co-conspirators is almost incalculable. "The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, No. 16 Cr. 453 (RJS) (Dkt. No. 160, Tr. 27). "[T]he drugs at issue here cripple individuals and destroy[] families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (internal quotation marks omitted). When, as here, defendants fuel the narcotics trade and traffic substances as dangerous as cocaine and methamphetamine, they "participate[] in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and show they are "indifferent to the poison . . . being distributed and ruining people's lives." *United States v. Aguirre Cuero*, No. 15 Cr. 125 (PKC) (Dkt. No. 36, Tr. 22, 24).

A significant sentence is warranted here not only to adequately deter the defendant from engaging in such conduct in the future but also to send a message to other individuals who may be considering similar narcotics activities. Those who traffic these drugs and seek to profit from the ruination of others should know that they will face serious consequences.

### C. Conclusion

For the reasons set forth above, the Government submits that a bottom-of-the-Guidelines sentence is sufficient but not greater than necessary in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: __/s/_____
Thomas S. Burnett
Jane Y. Chong
Matthew R. Shahabian
Assistant United States Attorneys
212-637-1064/-2263/-1046