UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 22 Cr. 618 (JPC)

BHUPINDER SINGH VIRK,

Sentence

Defendant.

------------------------------x

New York, N.Y.
July 17, 2024
3:30 p.m.

Before:

HON. JOHN P. CRONAN,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
MATTHEW R. SHAHABIAN
JANE CHONG
THOMAS S. BURNETT
Assistant United States Attorney

SULLIVAN & BRILL, LLP
Attorneys for Defendant
BY: STEVEN G. BRILL

Also Present:

Kelly Cunningham, Special Agent FBI
Samina Awan, Interpreter (Punjabi)
Jennifer Richards, Intern

(Case called)

THE DEPUTY CLERK: Can counsel starting with the government please state your name for the record.

MR. SHAHABIAN: Good afternoon, your Honor.

Matt Shahabian appearing for the government. With me at counsel table is Special Agent Kelly Cunningham from the FBI, AUSAs Jane Chong and Tom Burnett, and an intern with our office, Jennifer Richards.

THE COURT: Good afternoon, Mr. Shahabian, Special Agent Cunningham, Ms. Chong, Mr. Burnett, and Ms. Richards.

MR. BRILL: Sullivan Brill by Steven Brill for Mr. Virk.

THE COURT: Good afternoon, Mr. Brill and Mr. Virk.

Before we begin, we are being assisted by an interpreter today. I'll ask the interpreter to identify herself and the language she's going to be interpreting.

THE INTERPRETER: Yes. Samina Awan, Punjabi interpreter.

THE COURT: First of all, are you a certified interpreter in this court?

THE INTERPRETER: Yes.

THE COURT: And you've interpreted in the Southern District of New York before?

THE INTERPRETER: Yes.

THE COURT: Have you been sworn in today? Is your

oath on file or --

THE INTERPRETER: Not yet.

THE COURT: I'll ask Ms. Henrich to please swear in the interpreter.

(Interpreter sworn)

THE COURT: And Mr. Virk, if at any time you have difficulty hearing the interpreter or otherwise understanding the translation, please let me know or let Mr. Brill know and we'll address any issues.

THE DEFENDANT: (In English) Yes, your Honor.

THE COURT: So we are here today for Mr. Virk's sentencing. On December 6, 2023, Mr. Virk pled guilty to Count One of an indictment. That count charged him with a conspiracy to distribute narcotics. And in particular, he pled guilty to the lesser-included offense of conspiracy to distribute and to possess with the intent to distribute 500 grams and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B).

In preparation for today's sentencing, I have received and reviewed the following materials: The presentence investigation report, which is dated May 10, 2024, and appended as Appendix A to that report is judiciary sentencing information that contains sentencing data from the last five fiscal years for defendants whose primary guideline was 2D1.1

and methamphetamine was the primary drug, for whom the final offense level of 37 and the Criminal History Category was I. And that excludes defendants who received a substantial assistance departure. I also reviewed the defendant's sentencing submission dated May 28, 2024. That is a 27-page memorandum from Mr. Brill. It is at Docket Number 173. And I have reviewed the attachments to that submission.

Exhibit A is a video with translated subtitles from Mr. Virk's parents and his sister. Exhibit B is a copy of Mr. Virk's I-589 application for asylum and withholding of removal. Exhibit C are 19 letters submitted in support of Mr. Virk. Exhibit D are eight certificates that Mr. Virk received for completing courses at the Metropolitan Detention Center, one he received from the Westchester County Department of Health. That last certificate was issued from the Westchester County Department of Health because, from December 2022 to February 2023, Mr. Virk was incarcerated at Westchester County Jail.

Exhibit E is a letter from Mr. Virk himself. And then on June 21, I received from the Defense Exhibit F, which consists of two more letters in support of Mr. Virk. That is at Docket Number 191. I also reviewed the government's sentencing submission of June 18, 2024. That is at Docket Number 190. That consists of an eight-page letter signed by Mr. Burnett, Ms. Chong, and Mr. Shahabian. And I also reviewed

the government's supplemental submission of July 9, which is at Docket Number 196. That was filed in response to an order I issued on June 24 asking for clarification on certain drug quantity attributed to Mr. Virk. I also have reviewed the plea agreement in this case, as well as the preliminary consent order of forfeiture that I entered shortly after Mr. Virk's guilty the plea. And that forfeiture order is at Docket 110.

Has the government received and reviewed each of those submissions?

MR. SHAHABIAN: Yes, your Honor.

THE COURT: Have the defense as well?

MR. BRILL: Yes, your Honor.

THE COURT: Are there any submissions in connection with sentencing that I have not mentioned that I should have?

MR. SHAHABIAN: Not from the government, your Honor.

MR. BRILL: No, your Honor.

THE COURT: And Mr. Brill, have you read the presentence investigation report?

MR. BRILL: I have.

THE COURT: Have you discussed it with your client?

MR. BRILL: Yes, I have.

THE COURT: And Mr. Virk, have you also read the presentence investigation report?

THE DEFENDANT: (In English) Yes, your Honor.

THE COURT: And have you discussed that report with

your attorney?

THE DEFENDANT: (In English) Yes, your Honor.

THE COURT: And I will just note you're responding in English. Is that your preference to respond to questions in English?

MR. BRILL: I mean, he speaks English very well, your Honor, and intends to make a statement in English as well. Does the Court have a preference as to how it should go? Because he speaks both.

THE COURT: The reporter needs to know who to listen for as to response, if he's responding, whether the reporter should be waiting for the interpreter or for Mr. Virk.

MR. BRILL: He'll respond in his native language, Punjabi.

THE COURT: So let me just confirm that. Mr. Virk, have you also read the presentence investigation report?

THE DEFENDANT: (Through the interpreter) Yes.

THE COURT: Have you discussed that report with your attorney, Mr. Brill?

THE DEFENDANT: Yes.

THE COURT: Have you had enough time and opportunity to review the report and discuss it with Mr. Brill?

THE DEFENDANT: Yes.

THE COURT: Have you had the opportunity to go over with Mr. Brill any errors that you saw in the report?

THE DEFENDANT: Yes.

THE COURT: Have you also had the opportunity to discuss with Mr. Brill anything that you would like him to take up with me today at sentencing?

THE DEFENDANT: Yes.

THE COURT: So let me go to the report.

First, a couple of changes that I think should be made, paragraph 3 currently reads that Mr. Virk pled guilty to Count One of the indictment. I'm inclined to clarify that to read that Mr. Virk pled guilty to the lesser-included offense of Count One, which is conspiracy to distribute and possess with the intent to distribute 500 grams and more of mixtures and substances containing a detectable amount of cocaine, in violation of 21, U.S. Code, Sections 846 and 841(b)(1)(B).

Then in paragraphs 7 through 9, I will update to have the new sentencing dates for Mr. Virk's co-defendants. Mr. Cheema's is set for August 27. Mr. Habib's is set for August 21, and Mr. Burgos' is set for August 26.

Any objection to any of those changes?

MR. SHAHABIAN: No, your Honor.

MR. BRILL: No objection.

THE COURT: Now, Mr. Brill, footnote 2 on page 9 of your brief seeks a change to paragraph 76 in page 27 of the presentence investigation report to indicate that Mr. Virk began the process of seeking asylum in 2016, not 2021.

Mr. Shahabian, is there any objection to that change?

MR. SHAHABIAN: No, your Honor.

THE COURT: So I will change paragraph 76 in the fourth sentence to read as stated above, the defendant reported that he moved to the United States to seek asylum and began the process of seeking asylum, including by filing paperwork, after arriving in the United States in 2016.

And then on page 27 in the third paragraph, fourth sentence it will read, he began the process of seeking asylum including by filing paperwork after arriving in the United States in 2016 and his asylum -- and his application for asylum was granted in San Francisco California on June 20, 2021. Does that work for the parties?

MR. SHAHABIAN: Yes, your Honor.

MR. BRILL: Yes, your Honor.

THE COURT: Let me also ask about paragraphs -- well first let me clarify or just confirm maybe with the parties regarding the drug calculation, the government's letter of July 9 clarified how it calculated the drug quantity attributed to Mr. Virk which is 1,086 kilograms of methamphetamine and 476 kilograms of cocaine as well as 1 kilogram of opium. I take it, Mr. Brill, you have no objection to that calculation.

MR. BRILL: We don't, your Honor.

THE COURT: Then paragraph 33 to 41 talk about a violent Canadian drug trafficking organization called the

Wolfpack Alliance. It mentions that two of Mr. Virk's co-defendants were members of that organization.

The government acknowledges in its submission that Mr. Virk does not appear to be a member of the Wolfpack Alliance. I'm concerned that even though Mr. Virk isn't mentioned in those paragraphs, the burden of proof might rely on those paragraphs in making a designation determination.

Mr. Shahabian, is there a reason why we need paragraph 33 to 31 in this defendant's presentence report? I understand why for Mr. Habib and Mr. Cheema it should be there, but what about for Mr. Virk?

MR. SHAHABIAN: I hear the Court's concern about designation. I think while the defendant is not a formal member of Wolfpack, he certainly participated in a conspiracy to traffic narcotics on behalf of the Wolfpack and was advised, for example, by Defendant Cheema at the time that, for example, Defendant Habib was a member of Wolfpack.

So I think the facts of the Wolfpack Alliance and its connection to this conspiracy is relevant to the seriousness of the offense conduct for which the defendant's being held responsible, while acknowledging he's not a formal member. We're not arguing that, and we wouldn't suggest to the BOP that he be designated as such. But he knew who he was working with.

THE COURT: Mr. Brill?

MR. BRILL: Yes. I hear the Court's concern too, and

I appreciate the government's statements. The fact that Mr. Virk may be aware of it or was told of it, you know, is a far cry from certainly having any ties to it or engaging in any conduct with them in mind. Other than that would be pure speculation as to that.

And I think the heading "ties to the Wolfpack Alliance" in the PSR — and I should've highlighted this myself — doesn't clear up that confusion any better. In fact, it might make it worse. With that heading one might think that Mr. Virk has ties to the Wolfpack Alliance. So along the lines of the Court's concern, I will join in the Court's concern and also represent that I object to those provisions.

MR. SHAHABIAN: If I could offer, your Honor, the government would not oppose adding to the PSR to clarify that it is not the government's contention that Mr. Virk is a member of the Wolfpack Alliance, and we'd have no objection to that because we agree with that and put that in our sentencing submission.

THE COURT: Mr. Brill, does that satisfy your concern?

MR. BRILL: Well, look, I mean, I think if your Honor -- my answer has to be that as far as what's best for Mr. Virk and his appropriate designation and his safety, I would have to ask that those provisions be struck. I don't think that I can take the chance as his counsel to -- and hope that the BOP sees what we're going to add and ignores five

solid paragraphs otherwise. So I would have to disagree with that remedy and ask for it be stricken entirely.

THE COURT: I would agree with that concern. I'm not aware of any information firmly establishing that the drugs were being trafficked on behalf of the Wolfpack Alliance.

So I will strike paragraph 33 through 41. I think the government's suggestion was a reasonable one, but I still think there is a concern that it could impact Mr. Virk's designation where I don't see any association between him and the Wolfpack Alliance. And so this is clear too, of course, nothing in paragraphs 33 through 41 will factor into my sentencing today as well.

Are there any other objections to the factual recitation set forth in the report?

MR. BRILL: No, your Honor.

MR. SHAHABIAN: No, your Honor.

THE COURT: Hearing no other objections, I will adopt the factual recitations in the report with the modifications that I just went through. The presentence investigation report will be made part of the record in this matter and placed under seal. If an appeal is taken, counsel on appeal may have access to the sealed report without further application to me.

Let me turn to the guidelines calculation. Although I'm not required to follow the U.S. sentencing guidelines, I still must consider the applicable guidelines in imposing

sentence. To do that is necessary for me to accurately calculate the guidelines sentencing range.

Here there was a plea agreement. The plea agreement arrived at an offense level of 37, a Criminal History Category of I, and a resulting guidelines range of 210 months to 262 months' imprisonment. And it appears the probation department arrived at the same guidelines calculation.

And that's correct, right? There's no difference between the calculation in the plea agreement and the presentence report; is that right?

MR. SHAHABIAN: That's correct, your Honor.

MR. BRILL: Yes, your Honor.

THE COURT: And there is that slight difference in the amount of cocaine attributed to Mr. Virk. This does not impact the offense level or the guidelines calculation, but Mr. Shahabian, I take it you agree with the amount that is mentioned in the PSR and the explanation in I believe footnote one on page 5, and the total cocaine amount should be 476 kilograms, not 556 that I believe was in the plea agreement, and that the total combined equivalent drug weight should be 2,267,250 kilograms; is that fair?

MR. SHAHABIAN: Yes, your Honor, just because I missed where the Court was citing in the PSR, I just wasn't seeing that discrepancy.

THE COURT: Sure. I believe page 5, footnote one.

There was an issue of possibly the seizure in Kansas City being double counted, which would reduce the cocaine amount and then impact the total converted drug quantity amount.

MR. SHAHABIAN: That's correct. And the amounts that are in paragraph 4B and paragraph 56 use those corrected quantities.

THE COURT: And does either party have any objection to the guidelines calculation in the presentence investigation report?

MR. BRILL: No, your Honor.

MR. SHAHABIAN: No, your Honor.

THE COURT: And Mr. Shahabian, I take it the government moves for the third acceptance point under Section 3E1.1(b).

MR. SHAHABIAN: Yes, your Honor.

THE COURT: I will grant that motion and I will now set forth my guidelines calculation as it applies to Mr. Virk. The applicable guidelines is at Section 2D1.1 because the defendant's offense involved the equivalent of converted drug weight of approximately 2,267,250 kilograms, which is considerably more than 90,000 kilograms. The base offense level is 38 under Sections 2D1.1(a)(5) and (c)(1).

Two levels are added pursuant to Section 2D1.1(b)(1) because the defendant possessed a dangerous weapon, namely a firearm. Because of the defendant's acceptance of

responsibility, and doing so in a timely manner, I reduce the offense level by three points under Section 3E1.1. That brings the total offense level to 37.

The defendant has no criminal history, putting him in Criminal History Category I. And at offense level 37 and Criminal History Category I, the resulting guidelines range is 210 to 262 months in prison. And the guidelines fine range after determining the defendant's ability to pay is 40,000 to $5 million.

Now, I believe the plea agreement provided that neither party would be seeking a departure from that stipulated guidelines range. And here I'm talking about a departure, of course, not what is more commonly known as a variance from that range.

Mr. Brill, does the defense seek a departure?

MR. BRILL: No, your Honor.

THE COURT: The government?

MR. SHAHABIAN: No, your Honor.

THE COURT: Now, I also have to independently consider whether there's an appropriate basis for a departure. And I'll ask only Mr. Brill this, given the agreement in the plea agreement that pertains to the government. The drug weight here is really astronomical. It comes out to a converted drug weight of over 2.26 million kilograms. The highest offense level under Section 2D1.1(c) is 90,000 kilograms of converted

drug weight.

This is exponentially higher, what we're dealing with here. Doesn't that suggest that the guidelines here fail to adequately take into consideration the volume of drugs at issue in this case and an upward departure is warranted? I mean, we're not even close to 90,000 in this case.

MR. BRILL: Your Honor, are you asking me whether I believe an upward departure is warranted?

THE COURT: I know you don't want an upward departure, but I went you to convince me why I should not impose an upward departure based on the fact that we're looking at a drug weight that is, by my estimate, more than 25 times a drug weight that would trigger the offense level he's at. I mean, the guidelines don't seek to even consider this amount, this quantity of drugs.

MR. BRILL: Well, your Honor, I would first say that certainly between the government and myself, we certainly have had lots of discussions regarding a plea and drug weight and what would be appropriate, what would be mutually agreed upon. And certainly the plea agreement was what was decided. I understand this Court does not have to abide by that, but certainly the government was in the position, as well, to have your Honor's concerns, but chose to agree with the terms and conditions of the plea agreement.

THE COURT: Well, they couldn't agree to a higher

offense level because we're at the max under the guidelines. I mean, the plea agreement couldn't go higher under the guidelines here, and that's kind of my point. The guidelines cap out at a level that is 25 times lower than where Mr. Virk is.

MR. BRILL: Yes. Your Honor, the point you're honing in on is directly related to the argument I'm about to make, which in some ways is completely the opposite of what your Honor is saying, which is that Mr. Virk is facing significant time, significant time driven almost entirely by drug weight. And this strikes me extremely harsh and excessive and more than necessary, especially given his nonviolent nature in the case and the fact that this is his first offense.

So perhaps my argument to you is not necessarily a legal reason why an upward departure shouldn't apply -- well, maybe it is. And is that the facts and circumstances of the case, in addition to 3553 factors, perhaps make an upward departure unjust, excessive. Respectfully I say this.

I would also add that the fact that we are at this level is more about calculations of the guidelines than perhaps the reality. And in no way am I minimizing this extremely serious conduct, but your Honor is considering something very significant because of the way the guidelines has required the Court to view it, not necessarily directly related to Mr. Virk's mental state in engaging in this conduct.

So perhaps the upward departure, if the Court actually applies it, is a bit more technical than realistic or practical. And I say that with all due respect.

THE COURT: I appreciate that.

So I take your point. I've considered whether there's an appropriate basis to depart from the guidelines range. And I recognize I have the authority to depart, but I do not find the circumstances in this case warrant an upward or downward departure. I do think these are relevant arguments under Section 3553, which we'll get to in a moment. But in terms of the guidelines range, I will not depart from the guidelines range, and the guideline range remains 210 to 262 months in prison.

But let me then hear from the parties as to the appropriate sentencing. I'll hear from the government first, Mr. Shahabian.

MR. SHAHABIAN: Yes, your Honor.

This Court is aware the government is seeking a guidelines sentence. Specifically we're recommending a bottom of the guidelines sentence of 210 months' imprisonment. And there are certainly factors that led to that recommendation that I'm happy to walk the Court through. But of course I'm aware the Court has read the parties' submissions in detail.

The primary factor here is, while I agree with Mr. Brill that the drug quantity is a substantial driver of the

guidelines range here, this was a massive drug trafficking operation. In terms of actual seizures, law enforcement seized nearly half a metric ton of cocaine, nearly 100 kilograms of methamphetamine that the defendant was directly responsible for coordinating the cross-country transportation of from his home base in California to points east, and from there had it not been seized, likely to Canada.

This was not a one-time activity. This was not spur of the moment or unprompted. The defendant's cell phones show this was his business. Over and over and over he was coordinating large cross-country shipments of highly dangerous narcotics, specifically cocaine and methamphetamine that has wrecked devastation in this country and in Canada.

And while he is not the most culpable defendant in this courtroom in this case, he is certainly one of the more culpable narcotics defendants I have seen. I don't mean to compare my experience to the Court's experience, both on the bench and prior to the Court's current position.

But we're talking over a metric ton of meth that we estimated from a roughly six-month time span from his cell phone. And even that was conservative, as we mentioned in our supplemental submission. We didn't count things like the nine loads to Chicago because there were no quantities discussed. But if you reasoned out the past loads, I mean, each of these loads are close to 100 kilograms.

This is millions of dollars, if not tens of millions in narcotics flowing through this country and to Canada. And the defendant used his legitimate trucking business as the perfect cover for moving effectively, efficiently, and repeatedly these gargantuan quantities of narcotics.

And I think it bears noting that he did so -- these estimates, with the exception of the Kansas City -- not the exception. The timeframe is relevant. The first two drugs in the quantity are the Kansas City seizure and the New Jersey seizure. Even after law enforcement intercepted two of these shipments, the defendant was not deterred. He did not slow down, take a pause.

The remaining drug quantity, the nearly a ton of meth are the months following those seizures, leading up to his arrest in November 2022. We don't have evidence of the defendant's trafficking prior to February 2022, but there's no reason to think he started for the first time then. And so I put all that out there. While the government agreed not to seek an upward departure, these are certainly relevant facts for the Court to consider in determining the seriousness of the offense under 3553(a).

In addition to that, it's not just the quantity. It's the defendant's role in the conspiracy. He was not a passive participant. He was not someone who happened to drive a truck a couple of times that contained narcotics. He was an active

coordinator in the complicated ballet of moving dangerous narcotics from Mexico into this country and to Canada.

And we saw that in the intercepted messages that the government obtained in this case and summarized in its submission in one of the main group chats that led to the 400-kilo cocaine seizure in New Jersey, was titled "Joker bus." The defendant's alias in all the group chats was Joker. "Bus" is slang used by participants in this industry to refer to cross-country shipments of narcotics.

He's the organizer conducting other shippers and interested parties to play his part in getting the drugs from California to other shippers, in this case in New Jersey, who are then responsible for bringing the narcotics up to Canada had it not been seized.

And in the group chats we see the defendant checking with co-conspirators like Mr. Cheema and Mr. Habib about if people were in position to receive the narcotics and offload them quickly, discussions of quantity, confirmation of quantity, price for the shipments themselves, not for the narcotics. And it shows the defendant was a sophisticated participant in international narcotics shipments on a massive scale.

He is not as culpable as his co-defendants, Defendant Habib and Defendant Cheema, and that factored heavily in the government's sentencing recommendation in this case, given the

recommendations we've made for the appropriate sentences for those defendants.

THE COURT: And why is that? Is that for reasons in addition to or apart from the association of Habib and Cheema with the Wolfpack Alliance? I guess I'm more curious about their specific role in these shipments.

MR. SHAHABIAN: Yes, your Honor.

So it's not the mere tie to a known gang like Wolfpack Alliance that drove the recommendation. It is the conduct that we believe each defendant is fairly attributable or responsible for. In Mr. Virk's case, it is as this transportation logistics coordinator for the interstate shipments. We don't have evidence of his involvement in other activities that are driving the recommendations for his co-defendants.

For example for Mr. Cheema, certainly as the Court is aware, the evidence we've obtained that he's been orchestrating a series of shootings and threats in Toronto, even from the MDC, even after pleading guilty in this case, is a substantial driver of our recommendation for his sentence. We have at this time no evidence suggesting Mr. Virk is involved in those activities.

And with respect to Defendant Habib, there were the threats made against another participant in the conspiracy that are discussed with respect to Mr. Habib. While there are threats back and forth between Habib and Virk in this case

after the cocaine was seized, we did not assess either defendant threats points for that conduct. It didn't rise beyond that. Whereas for Defendant Habib, he's obtaining information about that person's spouse, their address, sending threatening messages on behalf of others.

So that sort of conduct escalating towards violence, in addition to Habib's much higher role in the Wolfpack Alliance, for example, enlisting others to try to smuggle wanted hitmen out of Canada such as Defendant Burgos, that additional relevant conduct is not conduct, as well as Mr. Habib's ties to Rabih Alkhalil, who this puts him more closer to the role of an owner of the narcotics, as opposed to Mr. Virk, who as far as the government is aware, is the transportation person.

We're not contending he has an ownership stake in the narcotics, that he's obtaining directly a cut of the profits of narcotics sales. From the evidence we've obtained, he is charging a transportation fee to move the narcotics, and that's his role. And it's a serious role and it warrants a serious sentence. But it places him, in the government's view, in a less culpable role than Mr. Habib, given his higher level in the conspiracy and his other activities than Mr. Cheema, given the direct and substantial post-plea ties to violence.

THE COURT: He did have almost a half million dollars in his apartment.

MR. SHAHABIAN: He did. This is not to suggest this wasn't a lucrative enterprise for Mr. Virk. He had half a million dollars in his apartment. He was arrested driving a fairly new model Mercedes-Benz AMG. Law enforcement obtained a ghost gun from the car he was driving, two more ghost guns in his apartment. I don't mean to minimize Defendant Virk's conduct. In the government's view, these are all very serious narcotics traffickers who deserve serious and substantial sentences for their conduct.

THE COURT: Is it the government's view that that money came from fees for the transportation, as opposed to an ownership interest in the drugs?

MR. SHAHABIAN: Frankly, we don't know. We have no evidence to suggest that he was getting a cut of narcotics proceeds. Certainly, if you look at just the sheer quantities that we have attributed to him over a six-month time span, it's not inconceivable that he's been doing this for a while. And the amount of drugs he's moving, he's generating significant profits purely from the pure transportation of the narcotics.

But we don't have evidence to suggest he was directly involved or profiting from the sales of the narcotics, aside from the fees he was charging for transportation. But that is itself a dangerous, important link in the narcotics world. The Court knows from this case there were recriminations after the millions of dollars of cocaine were seized in New Jersey,

threats to take polygraphs, threats of violence. I mean, the defendant played a major role in a large-scale sophisticated narcotics trafficking operation. Whether that was as a formal member of the Wolfpack or not, he did so repeatedly for an extended period of time and for profit.

In terms of mitigating factors, as the defense noted, obviously we took into account the defendant's upbringing, his claims for asylum, the fact that although the quantity is massive, he did not have or we could not prove the direct ownership stake that we think a defendant such as Defendant Habib is closer to, given his ties to Wolfpack and to Rabih Alkhalil.

And so that led, as well as our relative role assessment, to the recommendation of a bottom of the guidelines sentence. But while there are plenty of cases where the drug quantity overstates the defendant's conduct and 3553(a) warrants a below guidelines sentence, the government's view is in this case, given all these factors, a sentence at the bottom of the guidelines would be the just sentence under 3553(a).

If the Court has more specific questions about Defendant Virk's conduct, about how it relates to his co-defendants, I'm happy to provide additional details.

THE COURT: I think the detail you provided was helpful.

Let me also ask about a couple of the supervised

release special conditions recommended. As to the search condition, does the government have a view on that?

MR. SHAHABIAN: I think a search condition is appropriate, given that the defendant used his premises to engage in narcotics trafficking or business activities, that two of the guns were found there, the half a million in cash. He was leaving his house when he was arrested with the other ghost gun, the opium, the additional cash, so I think the search condition is justified.

THE COURT: There's also a recommended condition for drug and alcohol treatment. Is there a basis for the alcohol treatment part, at least this outpatient treatment, which may include testing to determine if Mr. Virk reverted to using drugs or alcohol? I saw information about his addiction to opium. I didn't see anything about alcohol, but I wanted to get your view on that.

MR. SHAHABIAN: I do not either, your Honor. And paragraph 82 says the defendant denied any history of alcohol consumption, and the government doesn't have any evidence to suggest otherwise. So I have no opposition to removing an alcohol treatment condition.

THE COURT: Thank you, Mr. Shahabian.

Mr. Brill?

MR. BRILL: Yes. Thank you, your Honor.

Your Honor, there is no question that we are dealing

with a massive amount of drugs here, gargantuan, as the government mentioned. So you'll get no pushback or argument from this table here. But in our view, as I've alluded to when we first started speaking, the guidelines calculation at 210 to 262, which is about 17 and a half years, is also gargantuan and also massive, despite the massive amount of drugs at issue here, given Mr. Virk's nonviolent nature and the fact that this is his first contact and arrest with no criminal history.

Probation did their own calculation, as the Court is aware. I'm sorry, not their own calculation, but their own investigation and recommendation. And obviously the Court is free to review that and impose the sentence that it deems appropriate. But they did agree to vary a bit from 17 down to 15 years. So in their view, at least, with respect to the investigation that they engaged in, which is extensive, as the Court knows — and they're certainly no friend of a defendant — they'll do what they have to do in order to provide the Court with relevant information. They agreed that a variance was warranted. We respectfully believe that a larger variance is warranted.

Mr. Virk has done 17 months in the MDC already, 20 months all together, and accepted full responsibility. So again, from this table you won't hear a denial of the facts, a minimization of the facts, but only an acceptance of responsibility, and no excuses also. He's, I believe, the

first one out of all the defendants in this case to plead guilty and accept responsibility.

The government in their wisdom and certainly, as we know, they don't fact bargain when it comes to plea agreements. In their wisdom in viewing this case — I understand their views on the case as a whole compared to the universe of drug conspiracy cases — but in their wisdom in this case, they agreed that a five-year mandatory minimum charge was sufficient in their view for Mr. Virk to plead to, as opposed to the ten-year mandatory minimum which he certainly was appropriately charged with, and certainly the facts could bear that out.

But in their view, given everything, they agreed to a five-year mandatory minimum. They did not have to do that, of course. And I want to believe — and I don't want to speak for them — but I want to believe it's because they viewed Mr. Virk differently from the other defendants in this case and perhaps less culpable than other defendants who they felt should be subject to a ten-year mandatory minimum.

It's easy for this Court to look at the drug weight, and the Court is clearly concerned with it and consumed with it, and rightfully so. So that makes total sense. Anyone that does what we do that look at this would have the same reaction. And it would be easy to just look at the drug weight and say that a guidelines sentence or somewhere around there is appropriate and just base the decision on the drug weight,

which is again massive.

But if the Court did that, then my respectful request for 90 months would be a very hard sell, and a large gap between what the guideline was and what my recommendation is. And so thankfully we have 3553 in this post *Booker* age that the Court can and will, as the Court has mentioned, value and review before imposing sentence.

Our respectful position is that if the Court views 3553 in the way we view it, then a 90-month sentence, which is about seven and a half years, becomes much more reasonable and appropriate when applying 3553 factors. I want to, if I can, your Honor, just focus the Court in a slightly different way in looking at the guideline calculation. I am not objecting to the guideline calculation. I stand by the guideline calculation.

But I can't help but feel that this is somewhat of a technical, unfortunate set of circumstances and perhaps unjust. And I say that word — I know it's a big word, but I'll say it because this is Mr. Virk's first offense. He has zero criminal history points. He's never been arrested here, and he's been in our country about eight years. He would be otherwise entitled, as other defendants in this case were — and I'll get to that — to a recent sentencing guideline amendment because of his lack of criminal history.

But because of the firearms that were found in his car

and in his home, that opportunity and amendment was wiped away.

THE COURT: Well, that's a pretty big "because."

MR. BRILL: Yes. Again, I don't mean to -- I mean, that's a fact. And when that was wiped away, in addition, the government would only agree to adding two points, given the possession of the firearm and in accordance with a proper guideline calculation of whether a firearm is possessed. And there lies the plus two. So all of a sudden we have a four-point spread.

I want to attempt to have the Court view this in this way: The firearms that were found look bad, right? You have guns in a car, you have guns in a home. But I have not heard or seen any evidence that connects any of those firearms with this case. I understand it does not have to. I understand the two points are correctly calculated.

There is no evidence that any of these weapons were ever fired, let alone fired at anybody. No threats with these weapons, no past acts with these weapons, nothing comes close with these weapons. The government in the past when I've made a bail application did allude to some chats that got heated because trucks were seized and people started to get nervous and angry, but that was it when it comes to kind of flirting with some level of threat. Certainly, there has never been any -- certainly Mr. Virk has never acted upon it.

So although we have a proper guideline calculation, we

have an individual who is part of a massive drug conspiracy who went -- and no part of that drug conspiracy based on lots of evidence involves weapons, at least with respect to Mr. Virk. I understand there's a very violent connection here that Mr. Virk has no direct connection to.

But yet, they were found when he was arrested at literally the last moment, has now essentially changed the course of his life. I know that sounds extravagant. But my analysis is that if that did not exist — and I understand it has to exist, but if that does not exist, then instead of a guideline calculation of 210 to 262, we would have an individual who had a base level of 38, minus two because of his zero criminal history and minus three because of his acceptance, we're at advisory guideline level 33. All of a sudden we're at a guideline calculation of 135 to 168.

You want to talk about a massive, a gargantuan spread, it's a 75-month spread. And so perhaps the Court feels you know what, having ghost guns in a car and in a home, no good, that is worth 75 months. And I have no -- the Court may very well feel — and respectfully I say this — may feel that that is appropriate, and the Court might not be moved by my argument.

But it seems that given the almost arbitrary nature of the firearms — again, not a good thing to have them, I'm not condoning it — but the arbitrary nature of it really affects what Mr. Virk is now exposed to. And we've mentioned

Mr. Cheema a lot. I'm certainly not going to engage in real discussion about him. I don't know what's happening with him now. I understand that things have changed significantly, significantly for him. And I understand that the government's recommendation from what I see is now extremely high, perhaps 25 years. They can correct me if I'm wrong on that.

But I think that's somewhat of a false equivalent right now to when we're discussing Mr. Cheema. Whatever has happened subsequent that the government has brought to the Court's attention, obviously extremely important issue. But if we can put that aside and go back in time before that was the case, Mr. Cheema — and again, please, I would ask the government to correct me if I'm wrong — Mr. Cheema was essentially when it came to the guidelines in a very similar area of Mr. Virk and did not have firearms on him at the time — which is somewhat ironic, but we can leave it at that — did not have firearms on him at the time, and I believe was exposed to a guideline calculation of 135 to 168, which would have been Mr. Virk's guideline otherwise.

And things have changed considerably for him, so that's not the case anymore. But from a matter of fairness and the way to look at 3553, not the guideline calculation, but 3553, I would respectfully ask the Court to consider that when evaluating if 210 to 262 is where the Court should fairly be when it comes to viewing -- from a strictly guideline position

where the Court sees Mr. Virk. And I will say that if the Court agrees with anything I say, then all of a sudden 135 to 168, asking for 90 months is not as much of a hard sell. It's still a variance, of course, but it becomes more palatable.

Regarding Mr. Virk's personal history, your Honor, his life is pretty extraordinary. It obviously turned awful. And he alone, based on his choices, changed the course of his life. But if you loo lock at that video, which is pretty heart wrenching from his family, they repeat a lot that he was not like this, that they don't know how this could've happened. They are shocked that their child is the person sitting before your Honor.

He did not come to this country as a criminal. He did not come to this country to distribute drugs. He came here as a victim, a true victim, to save his life. He had the luck of the draw to be born impoverished in a country, in a region where he was the minority religion, and the majority wanted to kill him and people like him. And this is something that he realized at a very young age.

So despite that, pictures show and accounts show that Mr. Virk still went to school. He still engaged in activities. He still played sports. He still was with his family, despite this risk to him and people in his religion. But he had the wherewithal to escape when threats became real and he became victimized and it was essentially between life and death, and

came to this country, albeit improperly and illegally.

But luckily -- well, I say illegally initially, but luckily, based on our own immigration laws, he adjudicated his status and was determined by an immigration court that he indeed was eligible for asylum and was granted asylum based on the threat back home. And he came here essentially to live the American dream. As trite as that sounds, it's what was happening.

He came and worked a lot. He was in a convenient store seven days a week working for $5 an hour he tells me. He then, as we all know, became involved in trucking and started as a truck driver, a dispatcher, and then ultimately started his own trucking company where he would dispatch produce through California and other places. So this was a major success story in the making that he destroyed.

And there's no question that he understands that that was the worst mistake of his life. It has changed his life. He was faced with temptation of engaging in something this horrible and agreed to do it. So I would hope that when viewing Mr. Virk — and I know the Court will, in taking these sentences very seriously — I would hope that when viewing Mr. Virk, that he's looked at as who he was, who he has the potential to be, and who he -- well, who he was before he made this awful decision, and balance that against his actions here in this particular case.

Further discussing 3553(a)(2) factors, along the lines of just punishment, which is one of the factors, but I think really plays heavily in this case, is Mr. Virk's incarceration for 17 months at the MDC. This is no mystery right now. The Court is well aware of what's going on there: Well documented daily assaults, perpetual lockdowns, delays in medical care. Last statistics were there was at least four suicides in the last three years, which is devastating, and other violent deaths.

With respect to Mr. Virk specifically, the Court knows because we brought it to the Court's attention. That's how bad it was, that he was physically assaulted more than one time. He was threatened for his money. He was hit in his ear, in his jaw. I'm told that there was a knife on his neck. And other people threatened him along the way as well.

The other day he told me his jaw is still hurting because medical care is not what it could be on the outside. I once went to visit him and I was told that the entire -- it's called the Christmas vacation, December 13 to January 4. He was on lockdown December 13 to January 4, 15-minute showers every other day, had to eat his food in his cell, and no fresh air.

He tells me on his unit — with respect, I don't think this was a suicide, but someone cut their own neck and another person broke an old man's ankle. That's what I was told by

him. So this is horrible, and this is certainly a change for the worse. And obviously, incarceration is not supposed to be pleasant, and he's there because of his own choices, but there should be a limit in a civilized society that someone who is incarcerated is not tortured and doesn't experience potential serious injury or death on a daily basis.

And the Court is well aware that judges in our very district have viewed those conditions, been concerned about those conditions, and that has translated into sentences that they ultimately impose. Judge McMahon in 2021 says, "It is the finding of this Court that the conditions to which the defendant was subject are as disgusting, inhuman as anything I've heard about in any Colombian prison, but more so because we're supposed to be better than that. I think you've suffered triply as a result. I am convinced that no good would be served by keeping you incarcerated for one minute more than I'm required to do so by law."

So I would respectfully say — and there's no scientific conversion here and certainly no law that's mandating this Court, but I would respectfully say that the 17 months that Mr. Virk has spent in these conditions should be worth more than 17 months.

He has squandered his asylum, so he is going to be deported, which, again, I think adds to just punishment because he is going back to the area where he was threatened in the

first place. The Court may be aware of current events there, a certain government that is now in India that is still enemies of the religion that Mr. Virk belongs to.

And just recently, to put a finer point on it, there was a case — I believe that this U.S. Attorney's Office brought — where that government in India sent someone allegedly to assassinate a vocal critic here in this country, a vocal critic of the new Indian government. This is all alleged. There's an indictment. But it shows the threat and the risk that someone like Mr. Virk faces when he goes home. So your Honor's incarceration will be devastating to him and punitive, but certainly he will suffer additional punishment when he is home.

My own view in terms of his specific deterrence is I can't imagine that he hasn't gotten the message yet how wrong and terrible his choices were. He has suffered physically. He has suffered mentally. There would have to be something very wrong, which there's not, for him to engage in conduct to put himself at risk any more than he already has.

THE COURT: He did that. I mean, this is why I'm not sure how much your point about the conditions in India really are mitigating factors here. He was facing those conditions. He applied for political asylum here. The United States gave him that protection. It gave him the opportunity to get away from that, and he turned around within months of receiving

asylum by committing an extremely serious offense that put Americans from coast to coast in danger. I'm not sure I'm convinced that that's grounds for mitigation here.

MR. BRILL: Well, you know, I guess what you're describing is true of anyone who engages in criminal conduct, understanding the risk if they are caught and punished. I don't think it takes away from the real threat and risk that existed there for him, and I don't think it takes away from the risk and real threat that exists when he goes back.

I think what it does, to your Honor's point, it shows that he may have known it, but perhaps took the chance and thought that perhaps he would not be sent back and perhaps that he could get away with it without being here. So I don't know if that negates all of the mitigation because the reality remains that he will be subject to whatever threat and risk that he had faced before, whether he wanted to consider it or not when he was committing the crimes.

THE COURT: Can you help me understand the decision making here, too. He had a good job, a legitimate trucking company. He was making I believe about $100,000 a year. Why this?

MR. BRILL: I've thought about that because I've seen him more than anyone here — not in the audience, but here in this well. And the best that I can answer is that we have an individual who came here with good intentions who has the

ability to do good things and productive things. He did good things and productive things, to your Honor's point, but that maybe like others, he was not satisfied with doing it the correct way and wanted to take a shortcut to riches and status and was willing to take that chance.

I don't think it's anything deeper than that. I think we have someone who bought into the temptation, who didn't come here with the intention but who wanted to live that life and engaged in these acts in order to do that. So horrible errors in judgment, squandered everything for a very shortsighted reason.

But certainly, when it comes to specific deterrence, the message has been heard by him loud and clear. And I don't think 17 years will make it any clearer, 15 years will make it any clearer, or 10 years will make it any clearer. I think all of those sentences are significant sentences, and Mr. Virk has been deterred. And I should add that society in general would be deterred by numbers that I've suggested, as well.

But if I could just close by saying that — and perhaps maybe this gives the Court more of an understanding of who Mr. Virk is because it's hard to understand why someone would squander what Mr. Virk had, but he did not waste his time while in the MDC despite the fact that he was victimized. He certainly didn't commit any violent acts in there or engage in any criminal acts. Certainly if that were the case, you'd be

hearing about that today.

But instead, he did the opposite. He engaged in whatever good things he could, perhaps the real Mr. Virk coming through once again: Time management, entrepreneurship, marketing basics, leadership and influences, business acumen, basic bookkeeping, and a program called Live Better Know Better Program. So he has shown that this is someone who can do better and can be productive and is certainly much better than the person who decided to enter a serious drug conspiracy as he did.

I will close, your Honor, by quoting what one of his good friends, Mandeep Kaur said in his letter, which should hopefully give the Court again an understanding of who Mr. Virk is to him and who he sees him to be: "Bhupinder has shown remarkable resilience in the face of adversity. Despite facing numerous challenges in his life, he has remained steadfast in his determination to overcome obstacles and strife for a better future. I have witnessed firsthand his commitment to self-improvement and his sincere efforts to learn from his past mistakes."

So a guideline sentence or anywhere close to that, it's hard to understand how someone could recover from that after spending so many years serving a sentence like that. We would hope that the Court views mitigation enough to consider sentencing Mr. Virk to our respectful recommendation of 90

months instead. We believe that will achieve all sentencing factors and certainly, looking at it the way we look at it, is a sufficient sentence, but not greater than necessary.

THE COURT: Let me ask just a couple of I think relatively quick questions. One of them, on page 24 of your submission there's a photograph, an image that almost looks like a baseball card. I don't know what that is. Do you know what that is?

MR. BRILL: May I have a moment?

THE COURT: Yes.

(Counsel and defendant conferred)

MR. BRILL: Mr. Virk tells me that in India he organized a wrestling tournament, and this card in his language essentially honors him for doing that.

THE COURT: Understood. Thank you.

The government in its letter points to various statistics and information about the harm caused by methamphetamine and cocaine. Do you dispute any of that?

MR. BRILL: Not at all. That's what makes this case so serious, and you know I was going to initially, when I saw the guideline numbers and even what probation suggested, my first reaction was, goodness, you see those numbers with violent cases that involve children, that involve gangs, that involve death. But I thought more about it and understand that it's very reasonable to think that a crime like this has some

of those factors, as well, given the severity of drug use in communities.

THE COURT: And I also asked Mr. Shahabian about two of the supervised release conditions recommended by probation, the search condition and the drug and alcohol treatment condition. Do you have any view of either of those two?

MR. BRILL: With respect to search, I certainly have no objection to that. It's very possible that Mr. Virk will be deported and it will be academic, but I have no objection to that. I do stand by our request — I'm not sure I even put it in writing, but I'll do it orally — that your Honor, we respectfully request that your Honor recommends the RDAP program as a result of his opium addiction. The more I understood it, the more -- opium is akin to pain pills, but not in that form. And he possessed it on the day he was arrested, and I'm told he used it for several years before that day.

THE COURT: And as to designation recommendation, is there anything further you're requesting? For example, I don't know if this is needed or possible, but an institution that could accommodate the Sikh religion in terms of observations or food?

MR. BRILL: So unfortunately I'm not prepared to request a facility with that pedigree. Mr. Virk certainly has not asked for it, and what he has asked is that I ask the Court for a location in New Jersey.

THE COURT: Thank you. Does Mr. Virk wish to make a statement?

THE DEFENDANT: Yes.

MR. SHAHABIAN: Your Honor, before Mr. Virk speaks, if I could just briefly respond for the record to a few of the points that Mr. Brill raised.

THE COURT: Go ahead.

MR. SHAHABIAN: In terms of the swing in the guidelines range based on the 4C1.1 and gun enhancement, just to be clear, the government's recommendation was a bottom of the guidelines sentence, but that's not driven because that's what the guidelines range is. That was the government's view of an appropriate 3553(a) sentence here.

And particularly with respect to the guns and the unfairness that Mr. Brill points to, I just note for the record -- I mean, this wasn't a shotgun. These were unregistered ghost guns, several of them, as the Court may recall, from the bail hearing in this case. There were photographs that Mr. Virk took of himself posing with guns that look similar to the ghost guns recovered. So I just want to put that on the record.

The government factored in the length of the defendant's stay at the MDC and that those conditions are harsher than other BOP facilities in its recommendation.

Also, Mr. Brill noted the defendant's acceptance of

responsibility. The government factored that in as well, particularly in comparison to Defendant Habib, who, as the Court is aware, we're going to have a Fatico hearing about, among other things, his obstruction post plea.

With respect to the likelihood of deportation, I want to be careful here because I'm not an immigration lawyer, but there is no judicial order of removal. I'm not aware that it's a certainty. Certainly the defendant, I understand will lose his asylum, but whether other remedies such as the defense against torture remain available to him, particularly in light of the circumstances in his native India that Mr. Brill alludes to, I don't know one way or another whether he would have a viable claim, but I would object to the characterization that deportation is a certainty at this stage absent that sort of judicial order of removal.

And so I just wanted to flag those for the Court. If there are additional questions, I'm happy to address them.

THE COURT: Thank you.

MR. BRILL: Your Honor, with your permission, may Mr. Virk read his statement in English?

THE COURT: Yes. I think that is fine with me if that's his preference. And thank you for the heads up so the reporter knows as well.

THE DEFENDANT: (In English) Respectfully, your Honor, I have been thinking a lot about what I wanted to say to the

Court, and I wrote down those thoughts so that I would be able to make sure to express what I'm feeling.

I belong to a very religious middle class Sikh family, saw my father working hard in farms struggling to keep up. Being a Sikh community, I and my family had to face issue where people would come to our houses and threaten us. Because of safety, I left India and came here to United States of America, country I take great pride in.

Here, people are free to follow their dreams and worship as they choose. From there on, I took the financial responsibility for my family, making sure my mom and dad lives a comfortable life, my sister gets to go college, and my grandpa gets proper healthcare. After facing some loss in my business, I desperately needed money to support my trucks here and my family back in India.

I couldn't think of anything, and this seemed like an easier and shorter way. And I jumped in without thinking of any outcome, without thinking of just or unjust. I made a rash and terrible decision, and I was the worst -- and it was the worst decision I have ever made. It changed the course of my life in the worst way, and it may very well ruin my life forever.

Time alone made me reflect on my choices and how I was being too greedy for myself and my family, but never thought from the viewpoint of family who get affected by this and how

they feel when their loved one consumes such harmful things. I know it would be selfish for me to ask for forgiveness and a second chance at life.

I just want you to know that I have never stopped working on myself. I know I did wrong, even if it was for a short time, and that part can never be undone from my life, but at times like these can really change people from inside and I'm not different.

I would really like to prove myself once again and work hard to have my own business. I have a dream to having a food truck somewhere in California or maybe in Colorado and have a family of my own. If I made better choices, would be married to my girlfriend by now, as we had hopped. Not sure what our future will hold now, despite being so in love. Because of my mistakes, I don't even get to talk to my parents. I'm unsure how they even managing their lives after all this.

My sister's marriage was planned, and I really hope she's doing well. And I did miss attending her wedding and be part of all of the wedding festivities that she wanted me to join. I feel like I failed as a brother, son, and as a person to whom my responsibilities. Here I only blame myself for me being in this situation and for breaking the hopes of my parents.

If possible, I ask for mercy, but I also ask for a sentence that will punish me but also allow me the opportunity

to get out and prove that I can make better choices and be a better man that I know I am.

Thank you, your Honor.

THE COURT: Thank you, Mr. Virk.

Is there any reason sentence should not be imposed at this point?

MR. SHAHABIAN: No, your Honor.

MR. BRILL: No, your Honor.

THE COURT: I know it's a bit late in the day, but I'll ask everyone to bear with me while I go back to the robing room to gather my thoughts, and I'll resume shortly.

(Recess)

THE COURT: I'll start by explaining the factors I've considered in arriving at the defendant's sentence.

First, as required, I've considered the advisory guidelines range which, as I mentioned, is 210 to 262 months in prison. Under the Supreme Court's decision in *Booker* and the cases that followed it, that guidelines range is only one factor that I must consider in deciding the appropriate sentence.

I also am required to consider the other factors set forth in 18, United States Code, Section 3553(a). Those factors are the nature and circumstances of the offense, and the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense,

to promote respect for the law and to provide just punishment for the offense, the need for the sentence imposed to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

I also must consider the kinds of sentences available, as I mentioned, the guidelines range, any pertinent policy statement, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. In this case, there is no restitution. Also, under Section 3553(a), I must impose a sentence that is sufficient, but no greater than necessary, to comply with the purposes of sentencing.

And I have given substantial thought and attention to each of these factors in arriving at Mr. Virk's sentence. I will start with Mr. Virk's offense conduct, which is by far the most significant consideration in my mind. In doing so, I will consider the nature and circumstances of the offense, the seriousness of the offense, and the need to justly punish Mr. Virk's conduct.

Mr. Virk played a critical role in a large-scale and coordinated operation that sent massive quantities of illegal

narcotics to various locations in the United States. The volume of drugs that Mr. Virk was responsible for transporting is nothing short of staggering. I will start with the March 2022 shipment of cocaine to New Jersey because that is the conduct that most directly gave rise to the charges in this case.

Mr. Virk and his co-conspirators, including the three other defendants who are pending sentencing before me, arranged a shipment of 400 kilograms of cocaine into a warehouse in New Jersey. That is an extremely large shipment of narcotics, almost a half a ton. The street value of that amount of cocaine is enormous.

Mr. Virk played a central and active role in transporting those drugs to the warehouse in New Jersey. I certainly would not describe that role as being mostly at arm's length, as the defense contends in its submission. It was much more direct than that. His role was to arrange the shipment of the drugs by trucks from California to New Jersey.

He went by the alias "Joker." And over, Signal, an encrypted messaging application, he discussed details of the shipment with his co-conspirators. In fact, one of the group chats was called "Joker bus," a clear reference to the vehicular transport of the drugs Mr. Virk was arranging.

Mr. Virk was directly involved, as well, in assuring that the shipment occurred as planned. For instance, in a

March 18, 2022 group chat, Mr. Virk provided updates about the arrival of the drugs. His co-defendant, Surinder Singh Cheema, asked Mr. Virk if his people were close, referring to the warehouse location. And by "people," they were referring to Mr. Virk's workers who were transporting the cocaine.

Mr. Virk was asked about the total count of the delivery, and Mr. Virk and Mr. Cheema discussed that about 168 kilograms of cocaine had been delivered. Mr. Virk also sent messages about the anticipated arrival of his driver at the warehouse. And in another chat, Mr. Cheema attempted to coordinate the timing of the cocaine delivery by Mr. Virk's drivers so those drugs could then be transported to another driver for shipment to Canada.

On March 20 and 21, 2022, Mr. Virk sent more messages over chats in which he informed his co-conspirators about the anticipated arrival times of additional drug shipments and indicated that the cocaine would be arriving in packages in boxes, as opposed to in bags. From knowing such particulars and providing these updates, there can be no question that Mr. Virk was intimately involved in the details of the transportation of those drugs.

These are extremely large shipments coming to New Jersey. Between March 18 and March 21, 2022 law enforcement seized about 400 kilograms of cocaine that was shipped to the warehouse. And then law enforcement replaced

that seized cocaine with sham drugs and surveilled that sham cocaine being loaded onto a truck for delivery elsewhere.

Now, it's also important what happened next. Mr. Virk and his associates learned that the truck with the sham drugs had been stopped by law enforcement. They were concerned and angry about that stop, and they started pointing fingers at each other. At one point co-defendant Michael Gian William Habib responded with a photograph of Mr. Virk's driver's license in an apparent attempt to threaten Mr. Virk, to which Mr. Virk responded to Mr. Habib, "Tell your family to be safe."

Evidence obtained by law enforcement after Mr. Virk's arrest revealed that he was involved in several other very large drug shipments destined for other parts of the country, all of these on top of the 400 kilograms that went to the warehouse in New Jersey in March 2022.

Searches of electronic devices revealed that throughout 2022, Mr. Virk had multiple discussions about massive cocaine and methamphetamine shipments. Methamphetamine was referred to with the code word "winz" or "wins." In February or March of 2022, for instance, Mr. Virk and his associates discussed a shipment of 130 kilograms of methamphetamine that arrived at the same warehouse in New Jersey. That shipment was not intercepted by law enforcement.

In March 2022, Mr. Virk discussed with Mr. Cheema a

shipment of 80 books. That was a shipment of about 96 kilograms of cocaine and 86 kilograms of methamphetamine. And that shipment was seized by law enforcement near Kansas City, Kansas on March 2, 2022. In a group chat on March 11, 2022, Mr. Virk stated that nine loads — again referring to narcotics — had been delivered to Chicago, including a load containing about 200 kilograms of methamphetamine.

Mr. Virk's drug trafficking continued until close to his arrest in November of 2022. In a September 2022 group Signal chat, Mr. Virk and his co-conspirators once again, including Mr. Cheema, arranged for the transportation of what appeared to be 140 kilograms of methamphetamine. Mr. Virk confirmed during this chat the number of boxes of the drugs and the quantity in each box and told the others that his driver was on the way with seven boxes to pass off to another driver.

The seriousness of this offense is only amplified by the evidence that was recovered at the time of Mr. Virk's arrest on November 16, 2022 in Fresno, California. He was arrested in his vehicle in possession of an unregistered ghost gun, a high capacity magazine with 20 rounds of ammunition, $8,000 in cash, and a kilogram of opium. A search of Mr. Virk's residence recovered two more ghost guns, multiple high capacity magazines, ammunition, and approximately $479,000 in cash. It should go without saying that Mr. Virk obviously did not come in possession of nearly a half million dollars in

cash from his work with the trucking company.

As the parties agree, this case involves a massive amount of illegal drugs. In addition to the 400 kilograms that went to New Jersey, Mr. Virk is responsible for another 76 kilograms of cocaine, approximately 1,086 kilograms of methamphetamine, and 1 kilogram of opium.

To put that into context, I'll go back to something I raised earlier today. Under the guidelines, the drugs involved in this offense yield a converted drug weight of 2,267,250 kilograms. Not only does that put this offense at the top of the drug chart at Section 2D1.1(c) by a significant margin, as I discussed earlier, 90,000 kilograms or more of converted drug weight triggers the highest base offense level of 38. Mr. Virk's offense involved over 2.2 million kilograms of converted drug weight. In other words, this offense involved more than 25 times the converted drug weight that triggers the highest base offense level.

There was an argument that would not be frivolous to be made here that the base offense level of 38, if anything, understates Mr. Virk's conduct, and the transportation of such massive amounts of drugs is an extremely serious offense.

Cocaine and methamphetamine are deadly drugs that are destroying families and communities. These drugs are causing a massive death toll throughout our country. The government points to truly staggering statistic. Methamphetamine can

cause permanent brain damage and heart damage, violence, and other health effects. According to statistics presented by the government that go through 2019, the number of overdose deaths from psychostimulants, a category that includes methamphetamines, has skyrocketed in recent years.

According to data from the National Institute of Health, the age adjusted rate of drug overdose dose deaths in the United States involving methamphetamine more than tripled from 1,887 deaths in 2011 to 6,762 deaths in 2016, and overdose deaths involving methamphetamine nearly tripled in the United States from 2015 to 2019 among people ages 18 to 64.

And the same to be said about cocaine. Cocaine is a highly addictive drug that causes serious and potentially deadly health effects as well. Empirical data from the DEA shows that overdose deaths involving cocaine have skyrocketed since 2010. In 2010 there were 4,183 overdose deaths from drug poisoning involving cocaine. In 2018, that number was 14,666.

Turning to the need for deterrence and to promote respect for the law, I note this is the defendant's first conviction, but this was far from a one-time incident. Mr. Virk's conduct involved multiple drug shipments involving massive quantities of illegal drugs. These discussions about the shipments occurred from at least February to September 2022.

At least two large shipments went to the warehouse in

New Jersey. Another large shipment went to Kansas City. Another large shipment went to Chicago. Mr. Virk engaged in repeated communications about those shipments as they were in transit, including when some of the drugs apparently were intercepted by law enforcement. These communications show that this was his conduct over and over again and that he was using his trucking business to move these huge quantities of drugs.

And further, to the need for individual deterrence, I know that even after Mr. Virk learned that shipments were seized, he still was not deterred and continued to transport additional large quantities of drugs. This was hardly isolated conduct. This demonstrates a need for individual deterrence for Mr. Virk and for the sentence to promote in him respect for the rule of law.

There also is a need for general deterrence. The distribution of illegal narcotics in our streets causes immeasurable harm to our communities and families. I mentioned moments ago the harm caused to society by cocaine and methamphetamine, which is particularly devastating. The illegal transportation of such massive quantities of these drugs must be deterred.

I also have to consider Mr. Virk's history and characteristics. And in doing so, I've considered the various mitigating factors that do exist in this case. Mr. Virk experienced persecution in India. He was a victim of violent

assault on account of his religion as a Sikh and at the hands of activists with the Bharatiya Janata Party that led him to receive asylum in the United States.

I've taken into account the conditions at the MDC during Mr. Virk's incarceration. Without question, there have been periods of staffing shortages, lockdown, and troubling conditions during his incarceration. I have considered these jail conditions when arriving at Mr. Virk's sentence. At the same time, though, these jail conditions in no way diminish the seriousness of the offense that Mr. Virk committed.

I also have to consider the possibility and maybe even likelihood that Mr. Virk's asylum will be revoked as a result of his conviction, and that as a result he may be returned to a dangerous situation in India. Now, of course no one is to blame for that consequence other than Mr. Virk.

And as I alluded to before, in some ways the fact that Mr. Virk received asylum makes his conduct in this case all the more troubling. The United States gave Mr. Virk the opportunity to escape from the persecution he encountered in India and live lawfully here. And he secured a good job. He was making lawfully about $100,000 a year. Mr. Virk responded less than a year after receiving asylum by engaging in conspiracy to traffic massive quantities of illegal drugs through the very country that gave him protection and opportunities.

I also have read the many letters in support of Mr. Virk, many coming from family members and others from loved ones or friends. The letters consistently depict Mr. Virk as one who is active in his community with the local Gurdwara and someone who's very religious. They depict him as a deeply committed person to his family. They depict him as a caring, supportive, and compassionate friend.

One of the writers, Harman Singh Virk, for instance, wrote that the defendant helped him when his mother was ill. Many of the letters praised Mr. Virk as someone with integrity with a high moral character. Obviously, the conduct in 2022 marked quite a deviation from that.

I've also considered the effects of a lengthy prison sentence to Mr. Virk's parents and sister, who rely on him for support. As I mentioned, I viewed their video a couple of times. And without question, this has had a very real impact on them. The sad reality, of course, is that innocent people often are impacted negatively by a loved one's decision to engage in criminal activity.

I also have read Mr. Virk's letter to me. In that letter and his words today in court he expressed remorse for his conduct. And he says this experience has been a wake-up call for him. I hope that is certainly the case.

I've been also impressed with the many courses Mr. Virk has taken at the MDC and at the Westchester County

Jail, especially with many of those programs focused on developing corporate skills.

While I've considered these mitigating factors, I do conclude that in the end a very lengthy term of imprisonment is appropriate, given the extremely serious nature of Mr. Virk's crime, including the extensive period during which he was involved in trafficking huge quantities of narcotics in the United States.

I also want to note that I will impose a term of supervised release because the offense of conviction requires a minimum of four years of supervised release.  A term of supervised release should be imposed under Guidelines Section 5D1.1(c) even if or assuming there's a likelihood of deportation.

And regardless of whether supervised release is mandatory, there is no assurance that Mr. Virk's asylum will be revoked or that he will not be able to secure other relief to remain in the United States.  There is no assurance that he will, in fact, be deported, when that deportation would occur, and whether he would be in immigration detention pending deportation.  And given the offense conduct here and the great danger to society posed by distributing cocaine and methamphetamine, I find that post-release supervision is appropriate.

I will now state the sentence I intend to impose.

Mr. Virk, I'll ask you to please rise.

Mr. Virk, it is the judgment of this Court that you are remanded to the custody of Bureau of Prisons for 210 months' imprisonment to be followed by a four-year term of supervised release. I conclude that that sentence is sufficient, but not greater than necessary, to achieve the purposes of sentencing for the reasons that I just went through.

If you would like, Mr. Virk, you may be seated while I read the conditions of your supervised release that you must comply with and other details of your sentence.

Mr. Virk, the standard conditions of supervised release shall apply. Those are listed on pages 29 through 30 of the presentence report.

Mr. Brill or Mr. Virk, would you like me to read those conditions out loud?

MR. BRILL: No, thank you, your Honor.

THE COURT: If anyone would like me to read them out loud, I'm happy to do so, but otherwise I will assume Mr. Virk and the attorneys have read them and everyone has stated that they have read the presentence report.

In addition, you will be subject to the following mandatory conditions: You must not commit another federal, state, or local crime. You must not illegally possess a controlled substance. You must refrain from any unlawful use

of a controlled substance, and you must submit to one drug test within 15 days of your release of imprisonment and at least two periodic drug tests thereafter, as determined by the Court, and you must cooperate in the collection of DNA as directed by the probation officer.

I will impose certain special conditions of supervised release, which I will now explain. For each of the supervised release conditions, I will articulate I find that they are reasonably related to the statutory purposes of supervision, which include the nature and circumstance of the offense and the history and characteristics of the defendant, the need for the sentence imposed to afford adequate deterrence, the need to ensure the protection of the public, and the need for the rehabilitative and medical care needs of the defendant. I also find that these conditions will impose no greater deprivation of liberty than reasonably necessary to accomplish the relevant sentencing objectives that apply to each, and, further, that each condition is consistent with any pertinent policy statements of the sentencing commission.

Given the possibility that your asylum status will be revoked and the question of your immigration status in the United States, I order that you must obey the immigration laws and comply with the directives of immigration authorities. I find that this condition is reasonably related to your history and characteristics, specifically your immigration status, and

the need to promote respect for the law, given the instant criminal activity occurred while Mr. Virk was under a grant of asylum.

I also impose a search condition as recommended by the probation department. There are multiple grounds to support this condition. The offense involved a conspiracy to distribute large quantities of narcotics, with Mr. Virk coordinating the transportation of those drugs using his electronic devices.

In addition, when Mr. Virk was arrested, he possessed in a vehicle an unregistered ghost gun a high capacity magazine with 20 rounds of ammunition, $8,000 in cash, and 1 kilogram of opium. And then in his residence law enforcement recovered two more ghost guns, multiple high capacity magazines, ammunition, and about $479,000 in cash. Presumably much, if not all, of that cash constitute proceeds from illegal activities.

So I find in light of all those factors I mentioned, the recommended condition to be appropriate. Therefore, you must submit your person and any property, residence, vehicle, papers, computer, other electronic communication devices, cloud storage or media and effects to a search by any U.S. probation officer, and, if needed, with the assistance of any law enforcement.

The search is to be conducted when there is a reasonable suspicion concerning a violation of a condition of

supervision or unlawful conduct by you as the person being supervised. Failure to commit to a search may be grounds for revocation of release. You should warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted in a reasonable time and in a reasonable manner. I find that the search condition is reasonably related to the nature of the offense for the reasons I mentioned.

Given the information in the presentence investigation report that you became addicted to opium while in India and later obtained opium pills from a friend in California, I will impose a condition requiring outpatient drug treatment. I will not include a provision for alcohol treatment.

As a result, you will participate in an outpatient treatment program approved by the U.S. Probation Office, which program may include testing to determine whether you have reverted to using drugs. You must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments.

I authorize the release of available drug treatment evaluations and reports, including the presentence investigation report, to the substance use disorder treatment provider. I find that this drug treatment condition is reasonably related to your history and characteristics, as well as your need to address your rehabilitative and medical care

needs. And to allow for effective supervision, you shall be supervised by your district of residence during your time of supervised release.

There is no restitution in this case. At your guilty plea hearing, you admitted the forfeiture allegation in the indictment, and I entered a consent preliminary order of forfeiture and money judgment. As reflected in that order, I ordered, pursuant to Title 21, United States Code, Section 853, that you forfeit to the government a sum of money equal to $487,900, and all right, title, and interest that you have in the following specific property: $8,000 in U.S. currency that was seized from Mr. Virk's vehicle at the time of his arrest on November 16, 2022, $479,900 in U.S. currency that was seized from Mr. Virk's residence in Fresno, California. Again, that amount was $479,900. You also must forfeit a Louis Vuitton bag seized on November 16, 2022 from Mr. Virk's vehicle at the time of his arrest, and a 2020 Mercedes-Benz AMG GT 63 with vehicle identification number WDD7X8JB5LA014070 that was seized on November 16, 2022 at the time of Mr. Virk's arrest. All of these items represent proceeds traceable to the commission of the offense.

I'm not going to impose a fine because I find that you would not have the ability to pay it. I do impose a mandatory special assessment of $100. As to designation, I will recommend that Mr. Virk be designated to an institution with

the RDAP program and, if possible, to assign the defendant to an institution in New Jersey. Obviously, it will be for the Bureau of Prisons to make any designation determination, as well as any determination for his eligibility for the RDAP program.

Does either counsel know of any legal reason why the sentence shall not be imposed as stated?

MR. SHAHABIAN: No, your Honor.

MR. BRILL: No, your Honor.

THE COURT: I order that the sentence I have described be imposed as stated. I find that that sentence is sufficient, but not greater than necessary, to satisfy the sentencing purposes set forth in 18, United States Code, Section 3553(a)(2), which includes the need to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to the defendant and others, and to protect the public from further crimes of the defendant.

Are there any open counts as to Mr. Virk?

MR. SHAHABIAN: I don't think so, your Honor, but the government moves to dismiss them out of an abundance of caution.

THE COURT: I believe he was only charged with this indictment, but in an abundance of caution, I will dismiss any open counts.

Mr. Virk, I advise you that you have a right to appeal

from the judgment imposing the sentence, to whatever extent you have not waived it. If you are unable to pay for the cost of an appeal, you may apply for leave to appeal *in forma pauperis*. If that application were granted, you would be permitted to appeal without the payment of any fees. That notice of appeal must be filed within 14 days of the judgment of conviction.

Are there any further matters we should take up this afternoon?

MR. SHAHABIAN: Not from the government, your Honor.

MR. BRILL: Thank you, your Honor. Nothing.

THE COURT: Thank you all. Mr. Virk, I know this is a very long sentence. I do wish you the best. When you are released from prison, you will still be a relatively young man, and I do wish you and your family the best.

THE DEFENDANT: Thank you.

(Adjourned)